# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| VINCENT E. JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 C 6010 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| N'GENUITY ENTERPRISES CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On March 3, 2011, Judge Lefkow entered a TRO against the defendants. [Dkt. #198]. Pursuant to 28 U.S.C.§ 636 (c), the parties, on March 31, 2011, consented to jurisdiction here for resolution of Plaintiff's Motion for Preliminary Injunction and Motion for Appointment of a Temporary Receiver. [Dkt. ## 215, 220]. On April 1, 2011, Judge Lefkow entered an agreed order extending the TRO and instructing the parties to appear before me on April 1, 2011 at 9:30 to set a date and time for a hearing on plaintiff's Motion for Preliminary Injunction. The Order recited that "[t]he parties agreed to extend the TRO to that date." [Dkt. ## 218, 219]. Thereafter, in various hearings in open court before me, counsel for all the parties, including Mr. Krasnow and Mr. Glover, expressly agreed to extend the TRO until ruling on the motion for preliminary injunction.

In preparing the opinion on that motion, it became apparent that no order had been entered on the docket reflecting the agreement. I informed the parties of that omission and asked that they prepare an agreed order reflecting the agreement that no one disputed and which had been reaffirmed on more than one occasion. In an exchange of e-mails between the court and counsel for the parties on this issue, Mr. Miller, co-counsel for the defendants, did not dispute the existence of such an

agreement; he merely thought Judge Lefkow's order of April 1, 2011 made unnecessary any further order. A copy of that email was sent to all counsel, including his co-counsel, Messrs. Glover and Krasnow. Mr. Miller said in his email to me:

> Although the language if [sic] of the April 1 Order [of Judge Lefkow] is less than clear it is my understanding that the parties have behaved in a manner consistent with the language stating, "The parties agree to extend the TRO to that date" as meaning that the TRO is extended *until the time of a hearing and ruling* on the plaintiff's Motion for Preliminary Injunction.

[Dkt. #332](Emphasis supplied).

I disagreed with his reading of Judge Lefkow's order and explained my reasoning in a responsive email, but noted that the matter is "academic" since as the email confirms "we had all operated on the premise that all parties had agreed that the TRO would be extended until the preliminary motion was decided. In fact, that was explicitly agreed on at least one, and perhaps two or three court hearings." I asked that counsel send me an appropriate agreed order reflecting the agreement "so that in the event the case goes to the court of appeals, that court will be under no misapprehension as to what happened." [Dkt. #332].

On September 19, not having received the requested order, I asked my courtroom deputy to call to inquire if the order had been prepared. Before she could do so, counsel for the plaintiff called my secretary and said that a dispute had arisen and asked if I could see all counsel. I did so at 11 o'clock. Mr. Miller appeared for the defendants, with Mr. Glover participating by phone. Mr. Miller now took the position that if the defendants had agreed to extend the TRO until the ruling on the motion for preliminary injunction – his co-counsel's email to plaintiff seemed unwilling to concede even that [Dkt. #333] – the defendants would no longer honor that agreement because they had concluded the motion had not been decided quickly enough. This sudden shift in position

2

carefully put out of view the unconditional nature of their agreement and the long history of non-compliance with discovery by the defendants, both before the consent here and after the agreement to extend the TRO, and the effect of that misconduct on the pace of the case.

There have been four versions of plaintiff's motion to appoint a receiver [Dkt. ## 80-81, 140, 202, 210] and a supplement [Dkt. #263]. There have been two versions of his motion for a preliminary injunction. [Dkt. ## 226, 230]. These successive motions were, to a large extent, precipitated by the defendants' recalcitrance throughout the discovery process, which has given rise to motion to compel after motion to compel. It would seem that the defendants were in no mood to participate in the cooperative discovery required by the Federal Rules of Civil Procedure in the absence of repeated motions to compel and court orders requiring compliance with discovery requests. [*See e.g.,* Dkt. ## 69, 74, 100, 109, 111, 122, 124, 126, 127, 129, 130, 131, 134, 160, 162, 166, 171, 202, 203, 209, 226, 235, 259, 307, 320]. And even then they were non-compliant. [*See e.g.*, # 226, 307, 320].

As defendants reluctantly and sporadically produced records, plaintiff's counsel necessarily had to update their filings. And many documents defendants had not produced miraculously appeared when the defendants used them for their own purposes in their responses to Mr. Jackson's motions seeking a temporary receiver and preliminary injunction. The defendants even criticize the analysis undertaken by Mr. Jackson's accountant, Michael Pakter, as being based on limited information (*Defendants' Response*, at 9-10), when the extent to which the information Mr. Pakter had was due to the defendants' failure to provide records.

On May 4, 2011 after counsel for the defendants had simply ignored the briefing schedule on the motions for appointment of a receiver and motion for preliminary injunction, the plaintiff

filed a motion for a summary granting of the motions. No motion to extend the date of the filing of the defendants' brief was ever made, no brief was filed, and no justification for this omission was made. While I denied the plaintiff's motion, new dates had to be put in place. The Order went on to require the defendants to produce all documents relating to N'Genuity's dealings with the Small Business Administration. While an appropriate discovery request for those documents had been made to the defendants, the defendants objected to production on the ground that they did not have possession of the documents, which were in the possession of their lawyers. One of their lawyers in this case, Mr. Glover, was also counsel for N'Genuity's in its dealings with the SBA. The Order noted that the objection "could scarcely be more frivolous or more pretextual" since documents in the hands of a party's lawyer are within that party's possession, custody or control. [Dkt. #226].

As recently as September 7, 2011, the defendants were defying an order entered five months earlier on March 14, which required the defendants to immediately begin production of corporate and personal bank and financial records [Dkt. # 202] – records they had objected to producing. After five months, the defendants had yet to comply with that order. The stalling tactics undertaken by the defendants are detailed in Mr. Jackson's recent motion to compel. [Dkt. # 307]. At the hearing on that motion, defense counsel revealed that the individual defendants, rather than request all their bank statements and checks from their banks at once, requested a few at a time. Defense counsel sought to justify this behavior and also seemed to feel that there was an issue as to whether checks were even included in the order, especially in the case of Ms. Littlechief. But Ms. Littlechief was not singled out as a special case in the order, and the issue of checks was covered at the arguments that preceded the order. [Dkt. # 314].

4

The order of September 7, 2011 noted the defendants' continued non-compliance with the Order of March 14, 2011 and stated that "the conduct of the defendants in connection with their non-compliance with the Order of March 14, 2011 is especially egregious and reflects a continued disdain for and disregard of court orders and discovery obligations imposed by the Federal Rules of Civil Procedure." The order went on to caution the defendants that a continuation of discovery non-compliance would result in a recommendation to Judge Lefkow to revoke the permission granted Mr. Glover to appear *pro hac vice* and/or that a default judgment against the defendants be entered. The order concluded by noting that "[t]he defendants' non-compliance with the order of 3/14 is simply the most recent instance in a long history of non-compliance with discovery obligations." [Dkt. #320].

One of the prior instances in that long history was summarized in the Order of March 28, 2011, which said:

> At the over two-hour hearing on the motion to compel today, I expressed the view that I have shared with the parties at various times over the past several months, namely that the defendants have utterly failed to comply with their discovery obligations. Rather, at almost every turn, they have attempted to frustrate discovery and to conceal critical information. The most dramatic example involves the claim that there were no accounting or equivalent records for the corporate defendant, N'Genuity, either in digital or paper form for an eight to nine year period, even though the company was bringing in many millions of dollars annually.[1]. I had expressed the view that the representation that there were no records was "inherently incredible," and no court is bound to accept inherently incredible evidence. [Citations omitted]. Ultimately, my dubiety proved to have some foundation and following a court-ordered forensic examination of the defendants' computers, [[#155, 160]] the untruth of the repeated representations that there were no accounting records was revealed. This is not an isolated instance but one of many examples of the intransigence that has marked discovery in this case.

---

[1] The defendants claimed that N'Genuity's books and records were destroyed when N'Genuity changed its accounting system to Quickbooks, and that there were no paper accounting records, and that the company did not even maintain a general ledger. All of this was false, as the court ordered forensic examination of the defendants' computers would reveal. [Dkt. #155].

5

> ***
> At the hearing today, counsel for the defendants insisted that there has been no wrongdoing in discovery and if there have been lapses, they have been unintentional and made in good faith. I expressed the view that of the cases I have seen since becoming a judge, the conduct of the defendants in this case in discovery was the second worst that I had seen. [Citation omitted].*** This is not meant ... to indicate some ultimate opinion on the merits. I do not have sufficient proof before me to make such a judgment and, in any event, that is not my role in the case. I do, however, have sufficient first-hand, extensive involvement in the case to be able fairly to express again, as I have in the past, my grave concerns about the way in which the defendants have approached and dealt with their handling of discovery at every turn.

[Dkt. #209].

As the docket further reveals, the briefing on the pending motions was not complete. In fact, the plaintiff filed, on the morning of September 19, the Reply In Support Of His Supplement To Motion For The Appointment Of A Receiver And For Other Relief. [Dkt. #331]. The reply also contained a discussion of why the defendant should be held in contempt for having violated the May 4 Order [Dkt. #235] and an explanation of why the defendants should be compelled to respond to the tenth request to produce.

In short, the defendants are not at liberty to withdraw from an agreement that they and their array of experienced counsel unconditionally agreed to and to substitute a new agreement under which they would cease to be bound by the TRO and would only be required to give plaintiff's counsel three days notice of any conduct that the defendants deemed would otherwise fall within the scope of the TRO. Promises made to judges and relied on by the court and opposing counsel are not so easily ignored. *Cf. Charter House Insurance Brokers, Ltd. v. New Hampshire Insurance Co.,* 667 F.2d 600, 604 (7th Cir.1981)("an attorney's promise in open court to produce certain documents 'could be treated as the equivalent of an order' for Rule 37(b) purposes.").

It is especially unreasonable for the defendants to seek to justify their attempted, unilateral breach on a claimed delay that in no small measure is traceable to their own conduct in discovery – including having lied for months on end that N'Genuity had no books or records either in paper of digital form and their refusal to abide by explicit court orders. "'He who prevents a thing from being done may not avail himself of the non-performance which he has himself occasioned, for the law says to him in effect 'this is your own act, and therefore you are not damnified....'" *R.H. Stearns Co. v. United States*, 291 U.S. 54, 61-62 (1934) (Cardozo, J.). *Cf., United States v. Goodwin*, 449 F.3d 766, 772 (7th Cir. 2006) (Posner, J.)("It is in that sense that he is the author of the delay of which he complains."); *United States v. Cohen,* 145 F.2d 82 (2nd Cir. 1944) (L. Hand, J.), *cert. denied,* 323 U.S. 799 (1945)("It is particularly unreasonable for the accused ... to complain of that confusion of which they were the authors.").

The defendants continue to be bound by the Temporary Restraining Order to the extension of which they agreed. Disobedience of that order will have serious consequences.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 9/19/2011