**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **VINCENT E. JACKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 09 C 6010** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **N'GENUITY ENTERPRISES CO., IMPACT** | ) | |
| **MARKETING GROUP LLC, GLOBAL** | ) | |
| **FINANCIAL INVESTMENTS LLC,** | ) | |
| **LITTLECHIEF SPECIALTIES, INC., and** | ) | |
| **N'GENUITY-LITTLECHIEF ENTERPRISES** | ) | |
| **CO., Arizona Corporations; VALERIE** | ) | |
| **LITTLECHIEF, ALFRED BOWEN;** | ) | |
| **and DUSTIN THOMAS BOWEN.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

Vincent E. "Bo" Jackson achieved fame as a professional football and baseball player for the Los Angeles Raiders, Kansas City Royals, Chicago White Sox, and California Angels. Attempting to defy F. Scott Fitzgerald's dictum that "[t]here are no second acts in American life," Mr. Jackson formed a company called N'Genuity Enterprises, along with defendant, Valerie Littlechief. Things have not gone smoothly. He blames Ms. Littlechief, her husband, Alfred Bowen, and his son, Dustin, all of whom he accuses of looting the company of millions of dollars through payments to related corporations and through the less subtle device of direct payments to Ms. Littlechief that were disguised and concealed on N'Genuity's books. The defendants have denied any wrongdoing and have their own grievances against Mr. Jackson, whom they accuse of having abandoned the Company in favor of a national, fast-food chain.

The case began in the Circuit Court of Cook County and was removed to this court on

September 25, 2009. [Dkt. #1]. The parties are of diverse citizenship, the matter in controversy exceeds the sum or value of $75,000, exclusive of interests or costs, and the court has subject matter jurisdiction under 28 U.S.C. § 1332.  (*First Amended Complaint*, ¶21).

Mr. Jackson seeks a preliminary injunction to prevent any further diversions and to stop any action that dilutes or divests his ownership interest in N'Genuity through a contemplated merger with Impact Marketing Group LLC ("IMG")(a/k/a Global Financial Inv.), a company at least nominally owned by Ms. Littlechief's husband's sons, Dustin and Chad Bowen, and which purportedly is the exclusive marketing agent for N'Genuity.  It is Mr. Jackson's contention that IMG has received $5 million from  N'Genuity without having performed any services on its behalf.  He also asks for the appointment of a temporary receiver to monitor N'Genuity's financial transactions. In light of events occurring on September 19, 2011, some further discussion is needed in order to explain the present posture of the case.

On March 3, 2011, Judge Lefkow entered a TRO, in which she found, *inter alia*, that there was credible evidence that the defendants had dissipated assets of N'Genuity in violation of their common law and statutory fiduciary duties, that there was no adequate remedy at law, and that without a TRO the plaintiff would suffer immediate and irreparable injury. [Dkt. #198].  On April 1, she entered an Agreed Order extending the TRO and instructing the parties to appear before me on April 1 at 9:30 to set a date and time for a hearing on the Motion for Preliminary Injunction.  The Order recited that "[t]he parties agreed to extend the TRO to that date." [Dkt. ## 218, 219].

Pursuant to 28 U.S.C.§ 636 (c), the parties, on March 31, 2011, consented to jurisdiction here for resolution of Plaintiff's Motion for Preliminary Injunction and Motion for Appointment of a Temporary Receiver. [Dkt. # # 215, 220].  Thereafter, in various hearings counsel for all the parties

expressly agreed to extend the TRO until ruling on the motion for preliminary injunction. Without the agreement the TRO would have ended, or, if extended by the court without agreement, would have automatically become a preliminary injunction and immediately appealable. *Chicago United Industries, Ltd. v. City of Chicago,* 445 F.3d 940, 942 (7th Cir. 2006); *United Airlines, Inc. v. U.S. Bank N.A.,* 406 F.3d 918, 923 (7th Cir. 2005).

In preparing the opinion on the motion for preliminary injunction, it became apparent that no order had been entered on the docket reflecting the parties' agreement. I informed counsel and asked that they prepare an appropriate agreed order. In a recent exchange of e-mails between the court and counsel, Mr. Miller, co-counsel for the defendants, did not dispute the existence of such an agreement; he merely thought Judge Lefkow's order of April 1, 2011 made unnecessary any further order. A copy of that email was sent to all counsel, including his co-counsel, Messrs. Glover and Krasnow, who had made the agreement in the first place. Mr. Miller said in his email to me:

> Although the language if [sic] of the April 1 Order [of Judge Lefkow] is less than clear it is my understanding that the parties have behaved in a manner consistent with the language stating, "The parties agree to extend the TRO to that date" *as meaning that the TRO is extended until the time of a hearing and ruling on the plaintiff's Motion for Preliminary Injunction.*

[Dkt. #332](Emphasis supplied).

I did not share his reading of Judge Lefkow's order and explained why in a responsive email, but noted that the matter is "academic" since, as the defendants' email confirms, "we had all operated on the premise that all parties had agreed that the TRO would be extended until the preliminary motion was decided. In fact, that was explicitly agreed on at least one, and perhaps two or three court hearings." I asked that counsel send me an appropriate agreed order reflecting the agreement "so that in the event the case goes to the court of appeals, that court will be under no

misapprehension as to what happened." [Dkt. #332].

A dispute then arose between the parties, with the defendants taking the position that they were no longer bound by the TRO because a ruling on the motion was taking longer than they were comfortable with. All of this and the effect of the discovery disputes which necessitated updating of filings as information was obtained is explained in detail in the Memorandum Opinion and Order dated September 19, 2011, *Jackson v. N'Genuity*, 2011 WL 4375882 (N.D.Ill. 2011)[Dkt. ## 337, 338], which is attached as an Appendix to this opinion. *See also Jackson v. N'Genuity*, 2011 WL 4928912 (N.D.Ill. 2011).

Relevant briefing continued through mid-September. Among the issues was whether Ms. Littlechief and other of the defendants had violated the TRO by paying a large bill to a lawyer who did not represent N'Genuity. [# 331]. *See infra* at 26. In any event, as explained in the September 19th Memorandum Opinion and Order, all parties agreed to the extension of the TRO until ruling on the motion for preliminary injunction.

## I.

## FACTUAL BACKGROUND [1]
### A.

N'Genuity is an Arizona C-corporation, engaged in the distribution of wholesale food products throughout the United States. Mr. Jackson and Ms. Littlechief formed and incorporated N'Genuity in April of 2001, with Mr. Jackson owning 49% of the shares and Ms. Littlechief 51%. Alfred Bowen is married to Ms. Littlechief and has been integrally involved with her in the operation and administration of N'Genuity's business and finances. (*Memorandum in Support of*

---

[1]The factual findings in this section of the opinion and those in the Analysis section will serve as the required findings of fact pursuant to Rule 52(a)(2), Federal Rules of Civil Procedure.

*Motion for Preliminary Injunction*, Ex. AA). And, as discussed *infra*, at 20, Alfred Bowen has held himself out as an officer of N'Genuity and has been held out as a corporate officer by Ms. Littlechief, herself, in filings with the United States Government. Nonetheless, the defendants deny that he is an officer of the company. Mr. Jackson's role in N'Genuity has been in marketing. While neither Mr. Jackson nor Ms. Littlechief drew a salary from their company in its first few years, starting in 2005, Mr. Jackson received $120,000 per year and Ms. Littlechief made $132,000 per year. [Dkt. # 244, ¶ 17].

The defendants, through an affidavit from Alfred Bowen complained that Mr. Jackson didn't make any financial contribution in return for his 49% of the company. [Dkt. #200-1]. But Mr. Bowen doesn't suggest that Mr. Jackson was supposed to have done so. It is apparent that the defendants were content to give Mr. Jackson his 49% in exchange for his celebrity. And they did so with the knowledge that the previous venture they undertook with Mr. Jackson – selling energy bars through a company called Gamer – in defendants' own words, "failed miserably despite Mr. Jackson's name and picture appearing on all the bars and packaging." (*Defendants' Response*, at 2).[2]       If Gamer failed miserably – defendants' words – or "[f]elt like a Titanic" – Mr. Jackson's words (*Defendants' Response*, Ex. C, Jackson Dep., at 159) – N'Genuity wasn't much better in the beginning and still seems to be fairing poorly in terms of profit as opposed to revenue. The tax returns that the defendants have produced show profits of $142,000; $23,000; $101,000;

---

[2] According to Mr. Jackson, his promotional efforts – playing golf, attending events, autographing footballs, etc. – brought in 80% of N'Genuity's business. "[N]obody," Mr. Jackson said, "knew who the heck Valerie Littlechief or [Alfred] Bowen was." (Jackson Dep., at 65). The defendants contend that "all sales are driven by Ms. Littlechief's certifications and the marketing efforts of IMG." (*Defendants' Response*, at 3). These clashing conclusions are unhelpful. The only concrete evidence is the testimony of a former employee, Ms. Michaud, who was emphatic that IMG was a fake company that did no marketing at all. *See infra* at 39, 56.

$425,000; and $115,000 for the years 2002, 2004, 2005, 2007, and 2008, respectively. (*Defendants'*

*Response*, Exs. CC, DD, EE, FF, GG).[3] These profits were derived from revenues of $1.4 million,

$4.3 million, $14.8 million, $44.2 million, and $26.2 million for those same years. (*Defendants'*

*Response*, Exs. CC, DD, EE, FF, GG).

Mr. Jackson's unrest about the situation grew when, according to him, the defendants

repeatedly refused to let him see N'Genuity's financial records. The defendants, however, contend

that every December, N'Genuity provided Mr. Jackson with the company's financial records. Upon

the request of Mr. Jackson's accountant, N'Genuity forwarded some financial records in 2003 and

2006-2009 – although Mr. Jackson says that he did not get "all of the documents to which he was

entitled as a 49% shareholder and director prior to litigation." (*Plaintiff's Reply*, at 19).

As this was going on, Mr. Jackson contracted in April 2008 with the fast-food, chicken

sandwich dynasty, Chick-Fil-A, to use his name and likeness in its marketing efforts. [Dkt. # 75].[4]

The campaign included Chik-Fil-A's slogan, "Eat More Chicken." For the defendants, touting

chicken sandwiches directly competed with, and denigrated, the sale by N'Genuity of its "Bo

Burgers," and violated Mr. Jackson's fiduciary duty to N'Genuity. But Defendants fail to point to

any agreement that N'Genuity would have the rights to Mr. Jackson's name and image *exclusively*,

or that "Bo Burgers" even competed in the same market – or league – as Chick-Fil-A's well-known

chicken sandwiches, which garner the chain annual sales of $3.6 billion.

---

[3] Defendants claim N'Genuity had sales of about $740,000 in 2003, citing its 2003 tax return at Exhibit Q. (*Defendants' Response*, at 20-21). Exhibit Q is not the 2003 tax return, however, but an in-house income statement for the first eight months of 2002.

[4] Defendants citation here is to their amended counterclaim, which has since been superseded by their second amended counterclaim and rendered void. *See Flannery v. Recording Indus. Ass'n of Am.,* 354 F.3d 632, 638 n. 1 (7th Cir. 2004) ("It is axiomatic that an amended complaint supersedes an original complaint and renders the original complaint void.").

http://www.bizjournals.com/atlanta /news/2011/02/21/chick-fil-a-sales -jump-to-36- billion.html.

N'Genuity is a wholesale food distributor, after all, and Chick-Fil-A operates in the retail world of fast food restaurants. It is highly doubtful, to say the least, that Chick-Fil-A ever tried to sell chicken sandwiches to one of N'Genuity's wholesale clients, and defendants certainly don't point to any instance where that happened and do not point to a single client conflict. (*Defendants' Response*, at 3-4). But these are matters that go to the merits of the litigation are not relevant to disposition of the motions.

**B.**

From the commencement of the case, the defendants have intentionally sought to frustrate Mr. Jackson's legitimate attempts to obtain critical information through discovery. *See Jackson v. N'Genuity*, 2011 WL 4375882 (N.D.Ill. 2011)([Dkt. ## 337, 338]; Appendix, *infra*)*; Jackson v. N'Genuity Enterprises Co.*, 2010 WL 4928912 (N.D.Ill. 2010). Month after month, the defendants told the court and Mr. Jackson's counsel that the most basic financial documents needed not merely for this case, but to run a $30 million year company, simply did not exist. They went so far as to produce an affidavit from Dustin Bowen on September 3, 2010 in which he swore that electronic financial data prior to 2009 had been inadvertently destroyed and that the flash drives used for back-up "were completely unavailable." [135 – 3, Ex. J].

As the court-ordered examination of the defendants' computers in November 2010 revealed, the information that was alleged not to exist was often immediately accessible simply by opening the files on the defendants' computers. Even where the defendants had tried to delete important financial data, the information was often retrievable. And yet, much valuable information may never be recovered since the defendants have admitted that computers were likely destroyed. Dustin

Bowen admitted at his deposition on November 19, 2010 that at least three N'Genuity computers were taken out of service and "thrown in the dumpster." Although Mr. Bowen claimed to be unable to pinpoint when this occurred, his overall testimony fairly allows the inference that the destruction of N'Genuity computers took place during the pendency of the current litigation. (Plaintiff's Renewed Motion For Appointment Of A Temporary Receiver. [Dkt. 210-5, at , p.17; *see also* 13, *et seq*]. [5]

Thus, the defendants' ultimate production of some 70,000 pages of documents does not render meaningless the history that led up to that production and is not an indicia of good faith or an occasion for self-adulation. (*Defendants' Response*, at 14-16).

It cannot be too strongly emphasized that the rulings on the instant motions are not intended as a sanction for the defendants' conduct in discovery. Rule 37 and a court's inherent powers are the usual methods for dealing with discovery non-compliance and deterring future misconduct. *See Degen v. United States,* 517 U.S. 820, 827 (1996); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Rickels v. City of South Bend, Indiana,* 33 F.3d 785, 786-87 (7th Cir. 1994). Those are the rules and principles that will govern the separate motions for attorneys' fees that the plaintiff is seeking pursuant to a briefing schedule set on September 30, 2011.[6]

That does not mean, however, that the defendants' conduct does not have significant evidentiary and other implications for the decision of the motions for appointment of a temporary receiver and for a preliminary injunction. "It has always been understood--the inference, indeed, is one of the simplest in human experience" that, *inter alia*, a party's fabrication or suppression of

---

[5] The Motion refers to an Affidavit of Dustin Bowen. However, the exhibit number referred to is not

[6]At the court's request, counsel for the plaintiff has agreed not to renew a previously filed motion to hold the defendants in contempt.

evidence, 'is receivable against him as an indication of his consciousness that his case is a weak or unfounded one....' 2 J. Wigmore, Evidence §278 at 133; *see also* §278 at 139 (3d Ed. 1940).

## C.

As discovery progressed, Mr. Jackson was slowly able to uncover significant information. At her deposition, a former N'Genuity employee testified to facts that supported Mr. Jackson's contention that Ms. Littlechief and her family were in fact using N'Genuity funds as their own. Bank statements and other documents, ultimately produced, provided further and far more comprehensive confirmation. For example, there were a number of checks written to Ms. Littlechief's and Mr. Bowen's nanny in significant amounts and improperly shown as corporate expenses. Transfers of money to Ms. Littlechief were disguised as business expenditures and charged to cost of goods sold. Cost of bacon and chicken parts were favorite hiding places. Mr. Jackson detailed some of what had been learned in a Motion to Appoint a Temporary Receiver on July 26, 2010. [Dkt. # 80].

Opposing the motion, the defendants contended that Ms. Littlechief merely took "loans" from N'Genuity to pay for her and her family's and relatives' personal expenses, which she later "reconciled," or paid back. The defendants continually sought to explain that the recordations of the transactions as something other than what they really were were merely innocent "mistakes" and bookkeeping errors. The defendants also falsely claimed that they had produced all financial information that existed, "including all financial documents in N'Genuity's possession." [Dkt. #117, at 6]. An affidavit from Dustin Bowen dated September 3, 2010 swore that N'Genuity's electronic financial data prior to 2009 had been inadvertently destroyed and that the flash drives used for back-up "were completely unavailable," and N'Genuity "has been unable to locate any of the flash drives

used to back-up accounting records prior to 2007." [Dkt. #135 – 3, Ex. J, ¶¶6-7].

Several months would pass before the court-ordered examination of the defendants' computers would reveal the falsity of the representations that financial documents spanning almost a decade did not exist. (*See Plaintiff's Memorandum in Support of Motion for Preliminary Injunction*, Ex. A, ¶ 15, Ex. EE at 59; and Appendix, *infra*; [Dkt. #155]). But lacking sufficient proof because of the discovery non-compliance, Judge Lefkow felt compelled to deny the motion for the appointment of a temporary receiver on September 9, 2010. [Dkt. # 121].

On February 24, 2011, the fraud examiner hired by the plaintiff to review the materials obtained from the court-ordered examination of the defendants' computers summarized his findings that the defendants have diverted large amounts of money from N'Genuity through various devices: (1) N'Genuity paid millions of dollars to companies owned by the individual defendants, such as Impact Marketing Group LLC/Electronic Data Analysis ("IMG" and "EDA"), respectively owned by defendant, Dustin Bowen, and Littlechief Specialties (which is owned by Ms. Littlechief and Dustin Bowen).[7]

The defendants contend that IMG is a legitimate company that does all the marketing for N'Genuity and is merely being paid for its legitimate efforts. Mr. Jackson contends that it is merely a vehicle for funneling millions of dollars out of N'Genuity and into the hands of Ms. Littlechief and the other defendants. Mr. Jackson also contends that Littlechief Specialities is simply a vehicle which, although recognized and allowed by United States tax laws, is in reality a device for transferring money for the sole benefit of Ms. Littlechief and Dustin Bowen, at his sole expense.

---

[7] Ms. Littlechief has 2000 shares and Dustin Bowen has 500. (Response, Ex. SS, at 2).

The examiner also concluded, and it is not denied, that N'Genuity paid many of Ms. Littlechief's and her family's personal expenses and that she caused N'Genuity to make unlimited, interest-free, and indeterminable loans to herself. (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. 8).

The income statement for 2008 from one of N'Genuity's computers indicates a net income of $121,332.04. The income statement produced by N'Genuity's Certified Public Accountant, Wayne Clouser, indicates a net income of $618,727, while the corresponding tax return shows a net income of $86,400. An Excel worksheet that had been deleted by N'Genuity but recovered by Forentech (and is referred to as a "carved" document) shows a net income of $1,372,116.84. (*Plaintiff's Renewed Motion for Appointment of Receiver,* Ex. 4). The 2009 balance sheet produced by Mr. Clouser reflects a net income of $1,024,442.19.

The QuickBooks data shows a net income of $1,044,219.27, based on the accrual method of accounting, or $1,080,327.69, based on the cash method. N'Genuity's tax returns, however, show a net income of only $522,578. (Ex. 4). Information for the year 2010 is limited. The defendants have balked at producing any income statements, balance sheets or tax returns for that year. (*Defendants' Response*, at 14-16 (listing records produced)).

According to N'Genuity's financial data, its net income has significantly decreased, despite substantial increases in sales revenues. N'Genuity reported revenues of $27,827,242 and a net income of $522,578 in its 2009 income tax return. But, according to N'Genuity's QuickBooks data for that same year, net income fell to $272,127 even though revenues rose to $29,745,824. (Ex. 4). The defendants, without citation to any evidence, claim that, in 2010, sales revenues were about $30 million. (*Defendants' Response*, at 16). Mr. Jackson's concern is with the rather small amount of

profit being generated by these substantial revenues.

When Mr. Jackson and his accountant finally were able to examine the documents the defendants had labored for so long to conceal, it indeed appeared as though Ms. Littlechief was using N'Genuity as her "personal piggy bank," just as Mr. Jackson had contended. Entries for what could only be personal expenses and transfers of money in large amounts to Ms. Littlechief were all over the books, disguised as business expenses, deductible to the corporation.

The defendants do not deny the transactions or really account for the seeming inconsistencies in their own documents. Their excuse is that it was all due to bookkeeping "errors" and "mistakes" that have since been corrected. They also say that Ms. Littlechief was simply borrowing money and paying it back, admittedly without interest. This is a practice they claim, inaccurately, that is permitted under Arizona law. *See infra* at 17-18. Not surprisingly, Mr. Jackson would like a temporary receiver to keep an eye on N'Genuity's assets and a preliminary injunction to prevent further breaches of fiduciary duty.

But the outflow of enormous amounts of money from the corporation to Ms. Littlechief and her relatives and to entities controlled by them is only half of Mr. Jackson's concern. The other half has to do with where his ownership interest in the company went. He says that as a consequence of secret meetings among the defendants, his interest has been severely diluted. The defendants argue that the meetings were not secret, and that Mr. Jackson was his own worst enemy in the dilution of his interest because he had the opportunity to maintain the 49% ownership he started with. He simply chose not to. Mr. Jackson also wants an injunction to prevent any further dilution of his interest, which would take place if N'Genuity is allowed to go through with a merger with another – and related – company, IMG, which is formally owned by Ms. Littlechief's husband's

children.

## II.
## ANALYSIS [8]

### A.
### Preliminary Injunctions and Appointments of Receivers

### 1.

We begin with the basics. "A preliminary injunction is an 'extraordinary and drastic remedy,' ...; it is never awarded as of right...." *Munaf v. Geren,* 553 U.S. 674, 690 (2008). It "'should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'" *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)(emphasis in original)(citation omitted). *Accord Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of America, Inc.,* 549 F.3d 1079, 1085–86 (7th Cir.2008)(a "'preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'"). It is for the party seeking the injunction to make the requisite showing, not for the opponent to show the injunction should not issue.

In order for a preliminary injunction to issue, the plaintiff must show that it is *likely* to succeed on the merits, that it is *likely* to suffer irreparable harm without the injunction, that the harm it would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's repeated] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S.

---

[8] This section will serve as the conclusions of law required by Rule 52(a)(2), Federal Rules of Civil Procedure.

7, 20 (2008); *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010). Nonetheless, a plaintiff need show

only a "better than negligible" chance of success on the merits of at least one of his claims to meet

the threshold requirement. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at1096. The greater the

likelihood of success on the merits, the less net harm the injunction must prevent in order for

preliminary relief to be warranted. *Judge*, 612 F.3d at 546; *Hoosier Energy Rural Elec. Coop., Inc.*

*v. John Hancock Life Insurance. Co.,* 582 F.3d 721, 725 (7th Cir. 2009). "[T]he equitable personality

of injunctive relief requires the result to be a 'just' or 'fair' result rather than a 'correct' result."

*Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1435 (7th Cir. 1986).

Mr. Jackson bases his request for a preliminary injunction on his breach of fiduciary duty

claim. (*Plaintiff's Memorandum in Support of Motion for Preliminary Injunction*, at 7). "In Arizona

a director of a corporation owes a fiduciary duty to the corporation and its stockholders. This duty

is in the nature of a trust relationship requiring a high degree of care on the part of the director."

*Dooley v. O'Brien*, 244 P.3d 586, 590 (Ariz. App. 1st Div. 2010). The prohibition against self-

dealing that is inherent in a director's fiduciary relationship with the corporation and its

shareholders, underlies the corporate directors duty of loyalty. The Arizona Supreme Court in

*Master Records, Inc. v. Backman*, 652 P.2d 1017, 1022 (Ariz.1982) put it this way: "The fiduciary

relation of the corporate officers to the corporation . . . imposes upon them the obligation to serve

the purpose of their trust with fidelity, and forbids the doing of any act by them, or by any one of

them, by which the assets of the corporation are wrongfully diverted from corporate purposes."

While "'[m]any forms of conduct permissible in a workaday world for those acting at arm's

length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than

the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive,

is then the standard of behavior.'"*Dooley*, 244 P.3d at 590 n.4 (quoting *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928)(Cardozo, C.J.)). Obviously, the misappropriation of corporate assets amounts to a breach of this duty.

**2.**

The equitable remedy of appointment of a receiver, which Mr. Jackson also seeks, is designed to manage a defendant's assets during the pendency of litigation. *Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994). It is an especially appropriate remedy in cases involving fraud and the possible dissipation of assets, since the primary consideration in determining whether to appoint a receiver is the need to protect, conserve and administer property pending final disposition of a suit. *Id.* The determination of whether to appoint a receiver in a diversity jurisdiction case – and of course in cases arising under federal law – is a matter of federal, not state law. Fed.R.Civ.P. 66 (and advisory committee notes); *National Partnership Inv. Corp. v. National Housing Development Corp.*, 153 F.3d 1289, 1291 (11th Cir. 1998); *Regions Bank v. R & D Development Corp.*, 2011 WL 2149086, *3 (S.D.Ill. 2011)(collecting cases).

**B.**
**The  Defendants' Misuse Of N'Genuity Funds For Personal Expenses**
**And Their Claims Of Innocent "Mistake"**

**1.**
**Overview**

Even on the present abbreviated record, the evidence reflects something far more than a mere isolated incident or two involving questionable transactions being incorrectly categorized on the company's books. Rather, it reveals a pattern of disguised transactions, always in favor of Ms. Littlechief and her family, which are now sought to be explained as merely good faith, bookkeeping "mistakes." If the defendants' explanation is to be credited, no one is at fault except the bookkeeper – who, it ought be noted, has a college degree in accounting.  As discussed below, the defendants' excuses are  implausible.  The implausibility of testimony, inconsistencies between testimony and objective evidence are more important than demeanor in judging credibility and may be so great that no reasonable fact-finder would credit the testimony.  *See Kadia v. Gonzales*, 501 F.3d 817, 820 (7th Cir.2007); *United States v. Bradford,* 499 F.3d 910, 920-21 (8th Cir.2007); *Pinpoint, Inc. v. Amazon.Com, Inc.,* 347 F.Supp.2d 579, 583 (N.D. Ill.2004) (Posner, J.)(sitting by designation). *Cf. NLRB v. Dorothy Shamrock Coal Co.,* 833 F.2d 1263, 1268 (7th Cir. 1987).[9]

In isolation, any one of the claimed "mistakes" might conceivably be dismissed as just that and nothing more.  But there is a point when occurrences cannot be innocently viewed, and a pattern emerges that cannot be dismissed as innocuous. *See Castle v. Bullard*, 64 U.S. 172, 187 (1859)("Circumstances altogether inconclusive, if separately considered, may, by their number and

_____

[9] The Seventh Circuit has said that judges fool themselves if they think they can infer sincerity from rhetoric and demeanor. *United States v. Wells,* 154 F.3d 412, 414 (7th Cir.1998); *Mitondo v. Mukasey*, 523 F.3d 784, 788-789 (7th Cir.2008)(The belief held by many that they can determine truth "by careful attention to a witness's demeanor-has been tested and rejected by social scientists.").

joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof."). *Accord United States v. Rodriguez*, 975 F.2d 404 (7th Cir. 1992); *Murdaugh Volkswagen, Inc. v. First Nat. Bank of South Carolina*, 639 F.2d 1073 (4th Cir. 1981); *In re Elm St. in City of New York,* 246 N.Y. 72, 158 N.E. 24 (1927) (Cardozo, C.J.)("This group of conditions so unusual and particular is precisely fitted to the claimant's case, and only by a most singular coincidence could be fitted to any other. If we may not say of such a coincidence that it is literally impossible, at least we may say that one would be surprising, and several would be marvelous."). On the present record, that is the situation in the instant case.

### 2.
### Ms. Littlechief's Pattern Of "Borrowing" From N'Genuity
### And The Concealment Of The Transactions

#### a.

With the belated and forced production of financial records, the defendants have finally abandoned their pretext that there were no books and records in paper or digital format for N'Genuity for the almost ten- year period up to 2009. And they have largely abandoned their claim that N'Genuity funds were not used to pay Ms. Littlechief's personal expenses. Instead, they now argue that: (1) it is a practice that is appropriate under Arizona law, and (2) in each instance, Ms. Littlechief either repaid the advances, reported them as salary or bonus, or they were recorded as a loan which she has repaid. (*Defendants' Response*, at 24). To the extent the transactions were recorded on the books as something they were not, the defendants say it was a series of unfortunate "mistakes."

They rely on a single Arizona case – *Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz.

107, 412 P.2d 47 (1966) – to support their characterization of the loan transactions as nothing out of the ordinary. The defendants focus exclusively on this passage from *Tovrea*:

> [S]uch loans are valid if free from fraud and fair to the company . . . It has been held that a corporation can loan its surplus funds at less than the legal interest rate to directors dominating the corporation where there is no fraud and no showing that the funds could have been invested at a more substantial interest yield.

100 Ariz. at 124, 412 P.2d at 56. But the court went on to stress – in a passage not cited in defendants' brief – that loans to officers are to be "closely scrutinized" and should be set aside if they are unfair to the company. *Id.* 100 Ariz. at 123, 412 P.2d at 58. Also ignored by the defendants are the facts of the case, which are not remotely comparable to those that exist here.[10]

Significantly, the officers in *Tovrea* repaid their loans with interest, and the transactions were not disguised as something other than what they were. *See* 100 Ariz. at 121, 412 P.2d at 56. Ms. Littlechief's loans were interest-free, were disguised, and, as we shall see, the records rather strongly suggest she either owes a significant sum or that there have been more "bookkeeping mistakes." Why else the labored efforts to withhold and conceal the very existence of the financial records in the first place? Moreover, it's not enough for the defendants to simply claim, without proof or elaboration, that "any interest owing on the loans would have been minimal." (*Defendants' Response*, at 26).[11] Unsupported statements by lawyers in briefs don't count. *See IFC Credit Corp.*

---

[10] Under Arizona law, it is the burden of the fiduciary to prove a transaction in which he or she is involved is fair to the corporation and it stockholders. *Roche v. Golden Sky Lands, Inc.*, 107 Ariz. 335, 337, 487 P.2d 756, 758 (Ariz. 1966); *Tovrea*, 100 Ariz. at 123, 412 P.2d at 58; *Roche v. Golden Sky Lands, Inc.*, 107 Ariz. 335, 337, 487 P.2d 756, 758 (1971); *Kadish v. Phx.-Scotts. Sports Co.*, 11 Ariz.App. 575, 578, 466 P.2d 794, 797 (1st Div. 1970). The burden to show entitlement to preliminary injunctive relief is Mr. Jackson's, and I have not looked to Arizona law to shift that burden in any way to the defendants. State law does not alter the normal operation of the Federal Rules of Civil Procedure. *General Insurance of America v. Clark Mall Corp.*, 644 F.3d 375, 378 (7th Cir. 2011).

[11] Arizona law requires a fiduciary to demonstrate that funds could not have been invested at a more
(continued...)

18

*v. Aliano Brothers General Contractors, Inc.,* 437 F.3d 606, 610-611 (7th Cir.2006); *United States ex rel. Feingold v. AdminaStar Federal, Inc.,* 324 F.3d 492, 494, 497 (7th Cir.2003). Here, defendants admit there was no interest paid by Ms. Littlechief, and thus, *Tovrea* provides no safe harbor for the loans to her.

Documents only recently produced pursuant to court order by Jere Glover, defendants' lead attorney in this case and N'Genuity's counsel"in all matters concerning the small Business Administration," (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. W), should be considered in connection with the defendants' claim that the loans were perfectly above board. These documents were provided to the SBA with its 8(a) Annual Update in May of 2006. (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. X). The Annual Update included an Individual  Compensation Worksheet ("Worksheet") which did not reflect any loans or advances to N'Genuity shareholders. (*Memorandum in Support of Motion for Preliminary Injunction*, Ex. X, at 6).

It is the only SBA Worksheet the defendants produced in discovery. Yet, through a Freedom of Information Act Request to the SBA, Mr. Jackson learned that Ms. Littlechief submitted such Worksheets for every year since 2006 up to 2009. (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. Y).[12]

The SBA documents from Mr. Glover also show that on July 20, 2005, Ms. Littlechief

---

[11](...continued)
substantial rate than that resulting from a loan to a director or officer. *Tovrea, supra.*

[12] This was apparently just another in the unending series of "mistakes" by the defendants and their lawyers and their accountant and their bookkeeper. For reasons not totally clear from the briefs, the SBA was not at liberty to produce those filings to Mr. Jackson. Consequently, it is unknown whether N'Genuity reported loan activity for those years.

executed a contract with the Department of Defense. (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. Z). In that agreement, she identified her husband, Alfred Bowen as the Vice President of N'Genuity, (*Id.* at ¶¶18, 24), contrary to, the defendants' insistence in this case that he is not, and never has been, an employee of N'Genuity or held any titles with the company. (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. AA).

Mr. Bowen has sworn under the penalties of perjury in a supplemental response to plaintiff's interrogatories that he is not and never has been employed by N'Genuity or been an officer or director. According to him, all he has done "throughout the years" is to assist N'Genuity and his wife and his sons in N'Genuity's sales efforts. (Ex. AA).

Other documents filed with the federal government by Ms. Littlechief also show her husband as Vice President of N'Genuity. (*See id.*, Ex. BB). For example, on or about June 30, 2004, Alfred Bowen signed and transmitted to the United States Department of Agriculture Livestock and Feed Program an application with attendant documents in which he represented that he was a Vice President of N'Genuity. (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. BB). On June 26, 2008, Alfred Bowen also filed a document with the IRS on behalf of the company stating that he had the authority and power to grant power of attorney for N'Genuity to Mr. Clouser, N'Genuity's CPA. (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. CC; Dkt. # 117-1). Further, notwithstanding the defendants' current claim that Mr. Bowen has never been an officer or employee of N'Genuity, he is a signatory on N'Genuity's Bank One account. (Exs. DD, M and S). His son, Dustin Bowen, is also a signatory on the N'Genuity account, which identifies him variously as N'Genuity's secretary and its vice president. (Ex. DD).

Apparently for the defendants, consistency between representations in this case and those

taken with agencies of the United States and federal banks is a needless formality. But the inconsistency bears upon the defendants' credibility.

**b.**

As for the "loans" themselves, the defendants provide a Quickbooks register of "Transactions by Account" to support their take on things. (*Defendants' Response*, at 24-25; Exs. W; WW). The documents were compiled by Kathy Baker, N'Genuity's bookkeeper, who has an accounting degree from Terra Technical College in Freemont, Ohio. (*Defendants' Response*, at 25; Ex. W, ¶¶ 1-3). The records cover the year 2009.[13] Ms. Baker offered this explanation of her accounting methodology:

> The entries shown on these documents, as with all other internal entries that I made, were not the official records of the company but rather represent my understanding or guess of how various items of income or expense were to be accounted for or explained. For example, when I saw a check was paid, I sometimes had no way of knowing if it was for office supplies, repair of company vehicles or raw materials for food products. I would make a guess as to what these expenses were for since at first glance I had no way of knowing. The entries I made were almost always reviewed at a later date by the company's senior management, who knew more about them than I, and correctly categorized.

(Ex. W, Baker Decl., ¶ 5).[14] It seems odd, to say the least, that a person with an accounting degree would make guesses about how various items should be handled and never ask her boss, who was readily available to answer questions. And if hers were not the "official records of the company," what were, and where are they? Ms. Baker's claimed "guesses" have been provided in discovery in response to the plaintiff's demand for N'Genuity's financial data and books and records.

---

[13]  The defendants call this "accounting entry 14100." (*Defendants' Response*, at 24). While the five-page exhibit WW is clearly limited to the calendar year 2009, the defendants later claim it shows payments Ms. Littlechief made in 2010. (*Defendants' Response*, at 26). Simply put, it does not.

[14]  The defendants go so far as to suggest that Ms. Baker's entries should not even count since her records are not the official records of the company. (*Response*, Ex. WW, ¶5).

In short, Ms. Baker's explanation that she guessed as to how to make entries is simply implausible and defies common sense, which is a perfectly legitimate instrument for judging human behavior. Posner, How Judges Think at 116 (Harv. Univ. Press 2008). Moreover, it would appear that her guesses only involved entries where money was transferred to Ms. Littlechief. But if we were to accept Ms. Baker's assertions at face value, they nonetheless support Mr. Jackson's view that Ms. Littlechief was using N'Genuity as her own "piggy bank." Ms. Baker claims that her entries were reviewed by senior management (i.e. Ms. Littlechief) who reclassified the entries as needed. None of the disputed entries were reclassified until the filing of this lawsuit and the forced disclosure of N'Genuity financial data in discovery. [##155, 160, 162, 209].[15]

Here is an interesting example of Ms. Baker's accounting technique: A check made out to Ewing Industrial, a landscaping firm, was accounted for as "costs of selling bacon." (Ex. W, ¶ 7). Why (or even how) Ms. Baker, even if she had no degree in accounting, would have guessed at that designation is, not surprisingly, unexplained. Also unexplained is why "senior management" did not reclassify the expense promptly at or near the time of its entry, especially since Ms. Baker says that "reclassifi[cations]" were a "regular occurrence." (Ex. W, Baker Decl., ¶ 6). Perhaps they were, but not in relation to money that somehow found its way to and benefitted Ms. Littlechief and her relatives.

_____

[15] If Ms. Baker's story is true, one would have expected that senior management of a company with revenues of $30 million a year would have either fired her or at least instructed her to consult with "senior management" to determine how to classify an entry in the first instance, rather than guessing. Of course, that did not occur according to the defendants' proofs. Indeed, as recently as September 14, 2011, the defendants have reaffirmed that Ms. Baker designates various items, "without knowing yet whether [her designation] is ... appropriate...." The defendants call the documents that she prepares "preliminary." (*Defendants' Opposition To Plaintiff's Supplement* at 5-6). It is the defendants' continued position that whatever Ms. Baker does is not very authoritative. The inferences to be drawn from Ms. Baker's implausible explanation and the defendants' continued ratification of her claimed imprecision are not favorable.

The defendants' curious accounting system, which appears to have been designed or at least operated to conceal "senior management's" misappropriations is a further factor to be considered in whether the motion for a temporary receiver should be granted. *See Miller*, 2010 WL 5095812, *4 (primitive and inaccurate accounting methods in company with $3 million in annual gross sales prompted court to appoint receiver).

**c.**

The entries in the "Transactions by Account" document show a history of loans to Ms. Littlechief, and repayments by her, along with a running balance. For example, by March 21, 2009, Ms. Littlechief had taken about $36,960 dollars out of N'Genuity for personal expenses. On March 31, 2009, she paid in $133,000, giving her a credit of around $96,000. By December 31, 2009, Ms. Littlechief supposedly owed $19,777.08, according to this document. The defendants highlight those entries representing reclassifications that Mr. Jackson has called into question, including payments to Ralph and Rae Lamb, Ms. Littlechief's parents and $44,000 to the Betty Ford Clinic.

Mr. Jackson claims that Ms. Littlechief owes more: exactly $153,767.26. (*Plaintiff's Reply*, at 14). His reply brief explains his figure this way:

> Exhibit WW indicates two bookkeeping entries of $134,922.50 each. The first bookkeeping entry on December 11, 2009, shows a payment of $134,922.50 made by Littlechief on December 11, 2009, which N'Genuity has identified as cash in transit. (See, Defendants' WW, p.4.) This entry ties in with check #1151 in Defendants' Exhibit YY. Mr. Pakter acknowledged this payment in his original analysis. (See, Plaintiffs Exhibit 38.) After making this payment, and others, according to N'Genuity data, Littlechief owed N'Genuity $153,767.26 for the period ending December 31, 2009. (See, Plaintiffs Exhibit 38).

(*Plaintiff's Reply*, at 14). This appears to be an accurate assessment based on the entries in defendants' "Transactions by Account" document – Ex. WW – and defendants' exhibit YY, which are the checks Ms. Littlechief wrote to N'Genuity to repay these loans.

The final entry in defendants' "Transactions by Account" document is listed as "adjustment p" and indicates a $134,922.52 credit in Ms. Littlechief's favor that brought her outstanding balance to what defendants claim it was – $19,777.08. But there is no $134,922.52 check dated December 31st from Ms. Littlechief in defendants' Ex. YY. The final check for 2009 is the December 11th check for $134,922.52 – the identical amount of the "adjustment p" for December 31st. Viewing defendants' two exhibits together, it would appear that Ms. Littlechief was given double credit for the single, December 11th check. In other words, there is no source for the final credit of the year, and the two documents do not demonstrate that Ms. Littlechief had paid down her outstanding balance to $19,777.08.

Based on the two exhibits the defendants rely upon, Ms. Littlechief, unlike the officers in *Tovrea*, didn't repay her loans in full, and certainly not with any interest. Moreover, the fact that they were recorded not as loans but as cost of goods sold (bacon) and not properly classified until after the litigation began and documents were produced showing what had occurred, warrants the inferences Mr. Jackson has drawn.

### 3.
### The Misclassification Of Payments to Ms. Littlechief Under The Category, Cost of Goods Sold (Bacon and Chicken Wings) Rather Than As Loans

Another substantial "reclassification" occurred when Ms. Littlechief took out $247,497.18 from N'Genuity on September 30, 2008. (*Plaintiff's Memorandum of Law in Support of Request for Preliminary Injunction*, at 9; Ex. N). The payment was entered as "Loan Receivable – Stockholder." This was apparently one of Ms. Baker's correct guesses. But that was not the way "senior management" wanted the transaction reflected on the books. Somehow, with a few strokes of a keyboard, this quarter-million-dollar receivable was "reclassified" as "cost of chicken wings,"

(Ex. N), and Ms. Littlechief's debt vanished into the void. This was discovered on an Excel worksheet that the defendants solemnly assured the court did not exist -- but which Mr. Jackson's computer expert found on N'Genuity's computers. (Plaintiff's Renewed Motion For Appointment Of A Temporary Receiver,18). This reclassification reduced shareholder debt, while improperly increasing the cost of goods sold.

Predictably, the defendants' explanation is that it was another " mistake."[16]  Of course, it is unexplained how such a mistake could possibly have occurred since the "cost of selling chicken wings" and a loan to the senior corporate officer of N'Genuity would not seem to have anything to do with each other.  (*Defendants' Response*, at 24). Perhaps the mistake occurred after "senior management" made one of its routine "review[s]" that Ms. Baker said "almost always" occurred "at a later date." Ms. Baker would have had no motive to make on her own such a false entry.  The evidence, reasonably interpreted, warrants the negative inferences Mr. Jackson has asked the court to draw.

The defendants also somehow confused the cost of chicken wings with $50,000 in legal expenses in September  2008.  (*Plaintiff's Renewed Motion for Temporary Receiver*, at 19; Ex. 20). N'Genuity's general ledger– which the defendants also falsely claimed from the beginning did not exist – simply "reclassifie[d]" the $50,000 legal expense as "COGS [cost of good sold] Wings" on September 30, 2008.  The defendants' non-explanation is:

Some of the legal expenses identified . . . were put into Loans to Shareholders others

---

[16] The defendants rely, in part, on paragraph 24 of Mr. Clouser's declaration, and paragraphs 5-7 of Ms. Baker's declaration.  (*Defendants' Response*, at 24).  None of these paragraphs have anything to do with the $250,000 legerdemain.  (*Defendants' Response*, at 24; Ex. A, ¶ 24; Ex. W, ¶¶ 5-7).  Mr. Clouser does, however, address this entry in paragraph 21 of his declaration, saying that "it appears these are notations or a reminder of items that existed at some point in time, but were amended or corrected at a later date." (*Defendants' Response*, at 24; Ex. A, ¶ 21).  No further illumination is provided.

were properly identified as expenses of N'Genuity.

(*Defendants' Response*, at 25). Once again, we are assured that this was just another "bookkeeping mistake," easily made, since who can be faulted for seeing a relationship between a bill from a law firm and the cost of chicken parts. A competent receiver would not make such repeated "mistakes."

There were more unfortunate accounting missteps in April 2009, when the defendants categorized $16,430.80 paid to Ewing Industrial, a landscape and irrigation supply company (http://ewing1.com), as N'Genuity's "cost of selling bacon." (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. O; *Defendants' Response*; Ex. W, Baker Dec., ¶ 7). N'Genuity does not produce the food it sells; in other words, it's not raising hogs on property that needs to be irrigated or landscaped. According to the defendants, this was yet another understandable "mistake," which was reclassified as a loan to Ms. Littlechief – but not until defendants' accounting methods began to be discovered as the financial records were unearthed, despite the defendants' efforts to keep them from view.[17] Again, this is another recurring problem that appears tailor-made for a receiver. *See, e.g., Miller v. Up In Smoke, Inc.*, 2010 WL 5095812, *4 (N.D.Ind. 2010)(failure to maintain adequate accounting system one factor supporting appointment of receiver).

The "mistakes" continued even after the parties agreed on the extension of the TRO in April 2011. On September 7, 2011, Mr. Jackson's counsel filed a Supplement to his motion for the appointment of a temporary receiver (Dkt. # 317). The Supplement charges that since the TRO was entered in this case N'Genuity and the defendants have violated the TRO by making an additional

---

[17] For the 2009 calendar year, N'Genuity records show that Ms. Littlechief's salary was a little over $43,000. (*Plaintiff's Memorandum*, Ex. V). Given the salary, one could understand the difficulty in her paying a $16,000 bill to her landscaping company and thus the need to dip into N'Genuity's coffers.

$135,000 in payments to the law firm of Gallagher & Kennedy for work done for companies other than N'Genuity. This came on the heels of payments to that firm of over $32,000 in 2010, and an additional $41,267.20 from January 27 to February 16, 2011. Also, almost $5,000 was paid to David T. Bonfiglio in 2010. Among other things these lawyers were representing Alfred Bowen in a case in which he is a defendant in a matter unrelated to the operation of N'Genuity, in which Resolution Trust, is the plaintiff. (*Renewed Motion For Appointment Of A Temporary Receiver*, 22– 23; *Supplement In Support of Motion For Temporary Receiver*, 3-4 [Dkt. 3 24]).

Mr. Jackson's counsel contends that these firms do not represent N'Genuity, and the defendants make no claim that they does. (*See* Exhibit D to the Supplement which indicates the Gallagher & Kennedy firm does, indeed, represent IMG. [Dkt. # 324; at 3-4, Ex. D]). Thus, while the agreed TRO prohibiting the transfer of N'Genuity funds to businesses owned by family members – such as Dustin's and Chad's IMG – *or the use of funds for the personal expenses of individual defendants* [Dkt #198], N'Genuity funds were used to pay IMG's attorneys. When Mr. Jackson's counsel understandably asked the defendants to explain this apparent violation of the TRO in a letter dated July 22, 2011 (Dkt. # 324, Ex. I), their counsel refused to do so. Their unilluminating and carefully formulated response was: "all items on the . . . Legal Expense account, are exclusively for N'Genuity related matters." (Dkt. # 324; Ex. J).

Mr. Jackson's attorneys, pursuant to leave of court, served an expedited discovery request on the defendants for "invoices and engagement letters for all legal fees paid by N'Genuity from January 1, 2011, to present." (Dkt. # 324; Ex. K). Defendants refused on the grounds of attorney-client privilege – whose they did not say – relevancy, and undue burden, even though the TRO required that any payments to third parties for N'Genuity expenses had to be supported by bills.

(Dkt. # 324; Ex. L).  This was another "mistake," this time by the defendants' lawyers.

The mere fact of whether the Gallagher firm was doing work for N'Genuity or IMG or any of the other defendants or any of Mr. Bowen's other companies, is not privileged; if there actually is any confidential information in the billing statements, that information could have easily been redacted.  *See United States v. BDO Seidman*, 337 F.3d 802, 811 (7th Cir. 2003)(identity of client does not fall within scope of privilege except in "rare circumstance when so much of an actual confidential communication has been disclosed already that merely identifying the client will effectively disclose that communication."); *Matter of Grand Jury Proceeding, Cherney*, 898 F.2d 565, 567 (7th Cir. 1990)(identity of the fee payer is privileged only in limited circumstances where it would reveal the substance of a confidential communication); *Greviskes v. Universities Research Ass'n, Inc.*, 417 F.3d 752, 757 (7th Cir. 2005)(billing statement produced with privileged communications redacted).  Moreover, the information is clearly relevant to the issue of whether the defendants were violating the TRO, and it is difficult to see how the production of a fee billing statement would be *unduly* burdensome.  In any event, boilerplate claims of undue burden are insufficient.  *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 351, 360-361 (N.D.Ill. 2005)(collecting cases).

It was not until September 14, 2011, when  the defendants filed their Opposition to the Supplement, that the defendants attempted to explain the payment to the Gallagher firm. [Dkt #327].  As with other aspects of their denials of wrongdoing, the defendants contented themselves with conclusions devoid of explanation or proof.  This time it was the *ipse dixit* of a Gallagher & Kennedy lawyer that the payment to his firm was perfectly proper and that with the exception of one hour, all of the time billed to N'Genuity during 2011 "has been for the benefit of and in the interest

of N'Genuity in various matters." (*Opposition* at 2, Ex. A). The lawyer carefully refrained from saying that his firm represented N'Genuity in the "various matters" to which he alluded, only that the firm's services have been for the benefit of and in the interest of N'Genuity – whatever that may mean. Without more, his carefully phrased conclusion does not help the defendants and leaves unsettled the issue of whether the payments were proper under the TRO. "'[T]he great rule of law'... which holds a trustee to the duty of constant and unqualified fidelity, is not a thing of forms and phrases." *Globe Woolen Co. v. Utica Gas & Elec. Co.*, 224 N.Y. 483, 489 (1918)(Cardozo, J.).

Paragraph 3 of the TRO – to which the defendants' Opposition brief adverts, but in essence ignores, relying instead on paragraph 2 (*Opposition* at 4) – is critical. It prohibits the defendants from transferring any of N'Genuity's funds to anyone in payment for any personal expenses incurred by any of the individual defendants or any of their family members or relatives. The Order makes no exception for payments that in the view of the defendants or their lawyers might be for the benefit of and in the interest of N'Genuity. If a payment was incurred on behalf of one or more of the individual defendants or their family members, it is quite beside the point that the work may somehow have also benefitted N'Genuity.

Significantly, the Gallagher & Kennedy lawyer does not identify whom the firm was representing, but it is a reasonable inference that it was not N'Genuity or he would have said so. *Compare Muhammad v. Oliver*, 547 F.3d 874, 877 (7th Cir. 2008)(Posner, J)("[I]f there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening."). On the strength of the present record, it is a reasonable inference that the client was Ms. Littlechief, her stepsons, her husband, Alfred, IMG, Littlechief Industries,

or perhaps all of them. Indeed, Gallagher & Kennedy was counsel for Alfred Bowen, Littlechief Specialties, and Ms. Littlechief in the formation of Littlechief Specialties. (*Response*, Ex. SS). And, as the plaintiff notes, the firm represented IMG and Global Financial, another of Mr. Bowen's companies, in this very case in responding to subpoenas served on those companies. In fact, the Gallagher firm has other involvements with Global going back a number of years and with Mr. Bowen, until earlier this year, having represented him in a case in which Resolute Trust obtained a $1.6 million default judgment. [Dkt. #210 at 22].

While the TRO does not prohibit reimbursement of N'Genuity business expenses, they "must be documented by receipt, invoice or other evidence of the nature of the expense and the amount of that expense." [Dkt. #198, ¶3]. The defendants have provided no documentation that would allow anyone to conclude that the payments to the Gallagher firm could properly be deemed a "business expense" of N'Genuity. It would have been easy enough for the defendants and the Gallagher & Kennedy lawyer to have left no doubt about the propriety of the payment under the TRO. But they chose a different course that would allow them to advance an argument that they had done nothing wrong. At least on the present record, there is a reasonable likelihood that Mr. Jackson will prevail on his claim that payment of the Gallagher & Kennedy bill by N'Genuity was another improper diversion of corporate funds to or for the benefit of Ms. Littlechief and her husband and their corporations.

## 4.
## Payments To Nannies And Housekeepers

As already mentioned, the individual defendants used N'Genuity funds to pay Kimberly Wensley, Alfred Bowen's and Valerie Littlechief's nanny. Ms. Wensley got about $64,000 in 2009 and about $72,000 in 2010. (*Memorandum in Support of Plaintiff's Motion for Preliminary*

*Injunction*, Ex.P; Dkt. #85, at 48-49).  At his deposition, Dustin Bowen indicated that Ms. Wensley was *not* an N'Genuity employee.  (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. Q, at 7 (listing  all N'Genuity employees)).  In their response brief, however, the defendants now claim that Ms. Wensley began working for N'Genuity in 2004 as a personal assistant to Ms. Littlechief.  They claim that in addition to handling schedules, appointments, and vehicle maintenance, she provides child care for Ms. Littlechief's children when Ms. Littlechief is on the road.  (*Defendants' Response*, at 25).

This assertion is based entirely on a single, conclusory statement from the declaration of N'Genuity's CPA, Wayne Clouser:

> 25. Plaintiff contends that payments for babysitting and housekeeping expenses were paid by N'Genuity . . . .  I examined the payments to Kimberly Wensley and determined that they were paid as compensation to an employee under appropriate IRS rules.

(*Defendants' Response*, at 25; Ex. A, Clouser Dec., ¶ 25).[18]  Mr. Clouser gives no hint as to  how he concluded that Wensley was an employee.  Without an explanation, it is impossible to tell whether his conclusion is reliable, and I cannot "'take on faith' whatever [Clouser] claims." *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997). *See also Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 319 (7th Cir. 1996).

The testimony of any expert – and, in the context of this case,  that is what Mr. Clouser is– must rest on a reliable foundation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993); *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1340 (7th Cir.

---

[18] Mr. Jackson concerns himself with payments to Ms. Wensley in 2009 and 2010, but Mr. Clouser also states that, prior to Ms. Wensley becoming an N'Genuity employee  – when that was he does not say – her remuneration was accounted for as compensation to Ms. Littlechief. (Clouser Dec., ¶ 8).  Again, he offers nothing in the way of support for this conclusion.

1989). An expert who provides nothing but a bottom line supplies nothing of value to the judicial process. *Minasian,* 109 F.3d at 1216; *Bourke v. Conger*, 639 F.3d 344, 347 (7th Cir. 2011); *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010).  And the bottom line is all Mr. Clouser provides. On the present record, Mr. Jackson has shown at least a reasonable likelihood of prevailing on his claim that the disguised payments constitute a breach of fiduciary duty.

Apparently to illustrate that no payment of money for Ms. Littlechief's personal purposes was too small to cause her to dip into N'Genuity's funds, Mr. Jackson points to a $1,350 payment to Lupe Navarro, the housekeeper for Ms. Littlechief and her husband, Alfred Bowen, in 2009. (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. R; Dkt. #84, at 33). Mr. Clouser claims – again without any reference to a financial record for support – that this payment was accounted for as part of Ms. Littlechief's compensation.  (*Defendants' Response*, Ex. A, ¶ 8).  Among other personal expenses for which N'Genuity funds were used is a $21,336.70 dental bill, a $3,533.70 payment to Design One Interiors, Inc., a $4,139.17 payment to APS  – the Arizona electric company –  and a $44,000 payment to the Betty Ford Clinic. (*Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, Ex. S; T).

Mr. Clouser dutifully characterizes these payments as further bookkeeping mistakes and says that they were later reclassified properly as loans to Ms. Littlechief or Dustin Bowen that were later repaid.  Mr. Clouser's contention that there has been a "conscious and consistent effort to segregate" the transactions which were for Ms. Littlechief's personal purposes," [*Renewed Motion For Appointment of A Temporary Receiver*, # 210 at 25], is not credible. Indeed, it "hovers on the brink of the preposterous."*Thomas v. City of Peoria*, 580 F.3d 633,638 (7th Cir. 2009)(Posner, J.).

More on these loans later, but the key point for present purposes is that it took litigation and

court-ordered examination of the defendants' computers before the company's books and records were admitted even to exist. And only then came the "reclassif[ications]" and correction of the "bookkeeping mistakes." The inferences to be drawn against the defendants are as obvious as they are negative. Given the three-card monte game the defendants play with bookkeeping entries when they are away from the glare of litigation, Mr. Jackson has shown a likelihood of success in proving misappropriation of corporate funds and repeated and intentional breaches of fiduciary duty. A receiver will help to ensure that there will be no continuation of the defendants' long-standing pattern of misappropriation of funds.

## C.

### Transactions Between N'Genuity And Related Companies1.
### Littlechief Specialties

On April 14, 2009, N'Genuity's corporate officers, Ms. Littlechief and Dustin Bowen, formed Littlechief Specialties of which they are the sole officers. Ms. Littlechief owns 80% of the stock and Dustin owns the remaining 20%. (Pl. Ex. 5; Defendant. Ex. RR (Commission Agreement)). Apparently, it was not until four months later on August 12th that Mr. Jackson was notified of a special meeting of the N'Genuity shareholders "to consider allowing N'Genuity to utilize an interest charge DISC." (Defendants' Response, at 22; Ex. PP, 8-12-09). A contemporaneous email to Mr. Jackson from Ms. Littlechief advised him that the special meeting "involves substantial potential changes in the way N'Genuity does business." (Defendants' Response, at 22; Ex. QQ).

The purpose of the special meeting was to discuss the creation of Littlechief Specialties as an Interest Charge Domestic International Sales Corporation ("IC-DISC"). (*Defendants' Response*, at 22; Ex. SS, PP). The firm of Gallagher & Kennedy were counsel for Ms. Littlechief, her husband, and Littlechief Specialties. *Id.* Indeed, the Gallagher firm were the lawyers who advised

N'Genuity in setting up Littlechief Specialties as an IC-DISC. (*Defendants' Response*, Ex. SS).

An IC-DISC is essentially a shell corporation permitting a business to defer portions of its taxable income obtained from export sales by making payments to the DISC. *See generally American Boat Co., LLC v. United States*, 583 F.3d 471, 486 (7th Cir. 2009); *Thomas Int'l Ltd. v. United States,* 773 F.2d 300, 301 (Fed.Cir.1985) (providing a thorough background of the DISC provision of the Internal Revenue Code); *ADM v. United States*, 37 F.3d 321 (7th Cir. 1994)(Posner, C.J.); *Dow Corning Corp. v. United States,* 984 F.2d 416, 417 (Fed.Cir.1993). The company that derives income from exports can make the payments up to 50% of income derived from export sales in the form of a "commission" to the DISC.[19]

The main or exporting firm can then deduct the commission payout from its reported profits. http://money.cnn.com/2008/09/02/small businessriding_export_wave.fsb/index.htm;http://www.forbes.com/sites/ deanzerbe/2011/03/29/ic-disc-the-big-tax-break-for-exporters//. As for the spinoff "DISC" it:

> is not taxed, but instead the DISC's shareholders [here, Ms. Littlechief and Dustin Bowen] are currently taxed on a portion of the DISC's earnings in the form of a deemed distribution. This allows for deferral of taxation on the remainder of the DISC's earnings until those earnings are actually distributed, the shareholders dispose of their DISC stock in a taxable transaction, or the corporation ceases to qualify as a DISC.
>
> A DISC sometimes does not generate the income it reports on its returns and might otherwise not be recognized as a corporate entity for tax purposes if it were not a DISC. The DISC may be no more than a shell corporation, which performs no functions other than to receive commissions on foreign sales made by its parent. [Here, N'Genuity].

---

[19] At one point, Mr. Jackson complains that "[f]or the period of July 1, 2009, to December 31, 2009, N'Genuity paid Littlechief Specialties $786,290. That represents 50% of N'Genuity's net income for 2009." (*Plaintiff's Renewed Motion for Appointment of Receiver*, at 12). It seems from the above explanations of IC-DISCs that the 50% payment was in keeping with what IC-DISCs are all about – so long as the payment was in accord with the percentage of export business done by N'Genuity.

*Hellweg v. C.I.R.*, 2011 WL 821090, *5 (Tax Ct. 2011).

N'Genuity has paid Littlechief Specialties a total of $1,186,290. For the period of July 1, 2009 to December 31, 2009, N'Genuity paid Littlechief Specialties $786,290. (Pl. Ex. I, Ex. 6). In 2010, N'Genuity paid Littlechief Specialties $400,000. (Pl. Ex. I, Ex. 7). Mr. Jackson contends that Littlechief Specialties is a mechanism through which Ms. Littlechief diverts N'Genuity funds to herself at his expense as a shareholder of N'Genuity. He also points to checks of $250,000 and $100,000 on September 17, 2009, and January 4, 2010, respectively, that N'Genuity wrote to Ms. Littlechief directly – rather than Littlechief Specialties – for what are now claimed to be IC-DISC "commissions." (*Plaintiff's Memorandum in Support of Request for Preliminary Injunction*, at 8; Exs. I, J). He also complains that Littlechief Specialties is paying dividends to *its* shareholders, with the "commissions" from N'Genuity to Littlechief Specialties. While this benefits Ms. Littlechief and her stepson, Dustin, it provides no benefit to Mr. Jackson.

The defendants don't really explain why the payments are made to Ms. Littlechief instead of Littlechief Specialties. Under the evidence in the record such direct payments would seem contrary to the way an IC-DISC operates.[20] The defendants merely say that the payments to Littlechief Specialties represent a net benefit to N'Genuity, with half of the payments reducing the amount that otherwise would be paid to IMG. On August 3, 2009, Mr. Clouser, in a fax to Mr. Bowen, estimated that once the DISC was set up, IMG "will no longer receive a commission on the

---

[20] Payments to an IC-DISC are not taxable to that entity which is required only to file an informational return. It is the shareholders who have a tax obligation, either in the form of a deemed distribution or an actual distribution at the time of the distribution. *See e.g., Tedori v. United States*, 211 F.3d 488, 489-490 (9th Cir. 2000)(explaining IC-DISC and payments to IC-DISC shareholders); *Thomas Intern. Ltd. v. United States*, 773 F.2d 300, 301 (Fed.Cir. 1985)("Instead, part of the DISC's earnings are taxed to its shareholder(s) as constructive dividends and the remainder is taxed only when actually distributed"); *Hellwig*, 2011 WL 821090, *5 (" the DISC's shareholders are currently taxed on a portion of the DISC's earnings in the form of a deemed distribution.").

sales of N'Genuity" thereby decreasing the cost of goods sold by 5.2%. Fifty percent of the profit would be paid as a commission to the DISC. (*Defendants' Response*, Ex. TT).

Mr. Clouser takes the same position in his Declaration in this court, claiming that the use of the IC-DISC saves N'Genuity thousands of dollars per year in taxes, and that "Littlechief Specialties will ultimately pay these funds to its shareholders . . . ." (*Response*, Ex. A; *Clouser Dec*. ¶¶15, 16). But Mr. Jackson is not among them. Mr. Clouser says that the $1,186,290 paid by N'Genuity to Littlechief Specialties did not divert funds to Ms. Littlechief "because they were to reduce amounts otherwise due to Ms. Littlechief as compensation. Littlechief Specialties will ultimately pay these funds to its shareholders taking advantage of the tax savings presented by the IC-DISC." (*Id*. at ¶16).

To repeat, the problem is that Mr. Jackson is not a shareholder in the DISC and, as the Gallagher & Kennedy firm's Memorandum to Mr. Bowen made clear, it is the DISC's shareholders, Ms. Littlechief and her husband's son, who will receive the dividends. (*Defendants' Response*, Ex. SS). Mr. Jackson will not benefit in the slightest from those distributions, whenever they might be made, and Mr. Clouser does not even hint at when that might occur.

Mr. Clouser offers no explanation for his conclusion that the payments reduced the amounts "otherwise due Ms. Littlechief as compensation." That would appear to be at least partly inaccurate, in light of the SBA's limits on compensation to $300,000 per year (13 C.F.R., 124.12 (d.)(3) – limits that the defendants, themselves, point out  resulted in $400,000 in overpayments as compensation to Mr. Jackson and Ms. Littlechief.   In short, Ms. Littlechief is the beneficiary of the payments to the DISC, Mr. Jackson will never see a penny of that money.  Mr. Clouser's Declaration does not deal with any of these factors, nor does it explain why, when Littlechief Specialties was established,

Mr. Jackson was not given a shareholder's interest at least equal to his interest in N'Genuity.

On the matter of compensation permissible under SBA regulations, it should be noted that in August 2009, Ms. Littlechief caused to be issued checks to herself in the amounts of $200,000 in total, but inaccurately shown on the books and records of N'Genuity as a loan to IMG. That "loan" has not been repaid, and Mr. Jackson hypothesizes, not without justification, that the payment was designed to get money to Ms. Littlechief indirectly that she could not directly take without violating the salary cap imposed by the SBA. (Plaintiff's Renewed Motion For Appointment Of A Temporary Receiver, at 16)[#210]. It may also be noted that under the Plan of Merger with IMG, all its obligations would become those of N'Genuity. It would thus appear that the $200,000 paper obligation from IMG would vanish even as a bookkeeping entry.

So, in the end, Mr. Jackson has a valid concern with the substantial payments made not only to the IC-DISC, but directly to Ms. Littlechief. Since it is apparent at this point that this is an appropriate situation for a receiver, this is one more thing that a temporary receiver can assure will be done correctly.

**2.**
**Image Marketing Group**

On February 23, 2003, Mr. Jackson, Ms. Littlechief, Alfred Bowen, and Stephen Bass, an attorney consulting with N'Genuity, had a three way conference call. Mr. Bass said that because SBA regulations would not allow the Bowens to work for N'Genuity since it did not have sufficient capital, he suggested that Dustin and Chad Bowen do the exclusive marketing for N'Genuity in exchange for 5% of all sales receipts. (*Defendants' Response*, at 17; Ex. Exhibit HH, Stephen Bass Dec. ¶¶1-2, 3). Chad and Dustin were first paid as outside contractors. They incorporated Image Marketing Group ("IMG") in late December, 2004, with three members: Dustin and Chad, and the

third of Alfred's sons, Brandon. [Dkt. #92]. IMG and N'Genuity share bank accounts, [Dkts. #86-87].

In January of 2005, N'Genuity – by Ms. Littlechief – and IMG – by Dustin – entered into a written contract under which N'Genuity agreed to pay IMG 5% of its total revenues – the same arrangement that Mr. Jackson had approved at the February 23, 2003 meeting. (*Plaintiff's* [Second] *Renewed Motion for Appointment of Temporary Receiver* (Dkt. # 210), Exhibit 13).[21] Inexplicably, the contract was to be retroactive to February 27, 2003, two years before IMG was even incorporated, thereby requiring N'Genuity to pay IMG commissions during a time the corporation did not even exist. (Dkt. # 210, Ex. 13; Plaintiff's Memorandum In Support Of Request For Preliminary Injunction, Ex. L [230]. N'Genuity's financial data shows that N'Genuity paid IMG/EDA the following commissions in the period 2008-2010:

- 2008: $774,139.99

- 2009: $727,565.80

- 2010: $465,831.85
  
  _____
  
    $1,967,537.64

(Dkt. # 210, Ex.t 1, ¶ 9, Exhibit 15).

Defendants admit these payments and that since 2005 N'Genuity has paid IMG $5,000,000. These payments equal an average of 2.3% of N'Genuity's revenues for 2008 through 2010, not the

_____

[21] Mr. Jackson complains that the contract pays IMG 5% of total revenues as opposed to 5% of sales generated by IMG's marketing efforts. (Dkt. # 210, at 14). If IMG actually did all the marketing for N'Genuity – and under the contract IMG was the exclusive marketing agent – it would seem that it would be contributing to all of the sales. In any event, assuming without deciding the point, Mr. Jackson agreed to the arrangement and cannot be heard to complain. This, of course, assumes that IMG was a real company that actually provided marketing services. The defendants do not argue, nor could they, that IMG was entitled to 5% of N'Genuity's sales even if it did nothing. Such an arrangement would not be fair either to N'Genuity or Mr. Jackson in his capacity as a shareholder and would contravene Arizona law.

5% required by the contract. As a result, the defendants contend that N'Genuity "owes" IMG another $1,444,663.  (*Response*, at 18) [Dkt. #135-4, at 5-12].

Mr. Jackson claims that IMG was a sham, used to divert money to the individual defendants and circumvent the SBA limits on compensation of a company's owner. *See supra* at 37. (*Plaintiff's Renewed Motion for Temporary Receiver*, at 8).  There is evidence to support the contention. Michelle Michaud, a former N'Genuity employee, testified at her deposition that IMG was a "faux marketing company." When asked to define "faux," she said, "Fake. False."  When pressed by the defendants' lawyer as to what she meant,  she said emphatically: "It was a company that they have set up that doesn't do anything that they pay themselves out of."  (*Defendants' Response*, Ex. O, Michaud Dep., at 64).  Ms. Michaud said she remembered the SBA had issues with whether N'Genuity qualified as a large business or a small business. [Dkt. #84, at 33-35].


This exchange is significant.

Q.  How would you define marketing?

A.  Putting forth effort to gain business.

Q. What does IMG do?

A.  It derives commissions based upon sales.

Q.  Do you have any legal knowledge about corporations and what corporations are?

A.  No.

Q. Faux marketing company, to me that is a subjective judgment that this is illegal or improper?

A.  Okay.

Q. Would you agree with that statement?

A. I know it was a marketing company that was set up that didn't do anything. You can judge that however you want. It was a marketing company to my knowledge after being here for two years, they didn't do anything. That is where certain commissions went every month. What they did with that is their business.

All of this testimony is essentially ignored by the defendants' Response brief (at 12), as is the fact that Ms. Michaud apparently had no motive to lie since she testified without challenge either then or now that she has continued her friendship with Ms. Littlechief. When asked if that relationship had continued "because [she] didn't feel they had done anything wrong," she said, "business and personal are two different things. I keep them separate." (Michaud Dep., at 64-65, 116-117). Instead of responding to this testimony, the Response focuses on aspects of that testimony that are of no consequence.

For example, it incorrectly says that Ms. Michaud testified that she "had no idea what the legal meaning of a 'sham company'" was. (Response at 12). That question was never asked, and the word "sham" was not used by her or by the plaintiff's or the defendants' lawyer at the deposition – at least not in the sections quoted by the parties. But her testimony that IMG was a fake and false marketing company that did nothing conveyed the identical thought, and one need not be a lawyer to be able to express competently the opinion she did. Her assessment was not a legal analysis; it was the opinion of a testimonially competent witness. *See* Rules 602, 701, Federal Rules of Evidence.

The Response goes on to note that Ms. Michaud said she had no knowledge of "misuse or misappropriation" by N'Genuity and that she did not have any accounting experience or background and wouldn't know if the defendants had altered accounting records. (*Response* at 13). That is true, but irrelevant. First, the "' trouble with the absence of evidence is that it is consistent with *any*

hypothesis.'" *United States v. Holland*, 445 F.2d 701, 703 (D.C.Cir.1971). Second, Mr. Jackson has not offered her testimony to support his contention that the defendants have phonied up the N'Genuity records to cover up their diversions, but to show that the company was a fraudulent device to divert money from the Company to the defendants. Hence, the point sought to be made in the Response is pointless.

The Response also refers to Ms. Michaud's testimony that she did not believe that Alfred Bowen would be involved in "illegal things." (*Michaud Dep.*, at 116; Response at 13).[22] The defendants offer this evidence to show the unlikelihood that Mr. Bowen would be complicit in the breaches of fiduciary duty alleged by Mr. Jackson. But, as Mr. Jackson points out, there is contrary evidence that in fairness ought to be considered. Mr. Bowen has had a long series of difficulties, to put it in a light most favorable to Mr. Bowen, resulting in unsatisfied judgments against him in the millions of dollars, at least one of which involved admitted fraud of the most premeditated and cynical nature. *See e.g., Resolution Trust Corp. v. Bowen,* 2009 WL 89569, 1 (D.Ariz. 2009); *The Resolution Trust Corp., as Receiver for Lincoln Sav. and Loan Ass'n, F.A. v. Bowen,* 2008 WL 2001270, 1 (D.Ariz. 2008); *In re Bowen,* 198 B.R. 551, 557 (9th Cir. 1996)(affirming bankruptcy court's grant of summary judgment declaring Alfred Bowen's $875,000 debt nondischargeable because of fraud involving the pledge of stock that did not exist, which Mr. Bowen admitted);*Bowen Corp., Inc. v. Security Pacific Bank Idaho, F.S.B.*, 150 B.R. 777, 781 (D.Idaho 1993)(judgment against Alfred Bowen for $3,196,052.51). In *Lavigne v. Chase, Haskell, Hayes & Kalamon, P.S., 112 Wash.App. 677,* 679, 50 P.3d 306, 307 (2002). the court concluded that Mr. Bowen "presently lack[s] readily identifiable, attachable assets" to satisfy an $85,000 default judgment against him.

---

[22] Although the defendants do not cite it, Ms. Michaud testified that Alfred Bowen "will do things, again, up to the edge, but he is smart." (*Michaud Dep.*, at 116).

Not only do these transactions bear upon the weight to be accorded the opinion of Ms. Michaud and the persuasiveness of the inferences the defendants seek to draw from her opinion that Mr. Bowen would not do anything "illegal." They demonstrate a possible financial motivation for the conduct revealed by the evidence in the case. At a trial, Ms. Michaud's opinion of Mr. Bowen's character for honesty and the evidence of Mr. Bowen's financial difficulties might well not be admissible under Rule 404(a), Fed.R.Evid.– which prohibits the introduction of character evidence to prove action in conformity therewith -- at least not for the purpose for which the defendants offer that evidence. But the Rules of Evidence do not apply, or at least not with full vigor, in a preliminary injunction hearing, and the defendants can hardly object in any event, having opened the door by their affirmative use of the opinion evidence. In any event, the conclusions in this opinion do not in any way rely on the evidence of Mr. Bowen's past financial dealings in the sense that they are being considered to show propensity to conduct one's affairs in a less than honorable way. *See* Rule 404 (b), Federal Rules of Evidence.

Finally, Ms. Michaud said she remembered the SBA had issues with whether N'Genuity qualified as a large business or a small business. [Dkt. #84, at 33-35]. She was quite specific that there was a P.O. Box in Scottsdale, Arizona to receive checks that were intended for N'Genuity from third parties and should have gone directly to N'Genuity's offices. Dustin Bowen picked up these checks. This testimony certainly raises concerns about the defendants' skimming income and not showing it on the company's books. But this is a point Mr. Jackson's brief does not make, and so we move on.[23]

---

[23] Recently, it came to light that the defendants had failed to inform the plaintiff about the existence of an N'Genuity bank account at the Alliance Bank. Whether that account has anything to do with the checks sent to the P.O. Box remains to be seen. The defendants contend that it is not even an account that they have

(continued...)

Mr. Jackson further contends that he did not know about the IMG arrangement and that he did not approve it. (*Plaintiff's Reply*, at 10). That is questionable; however, it cannot be disputed that he did not approve the creation of a "fake" and "false" company that was to be a vehicle for the diversion of millions of dollars to the defendants. He says, moreover, that he did not even know about IMG until this lawsuit and cites six pages of deposition transcript in his brief. During this portion of the deposition, Mr. Jackson was asked what he knew about IMG before he saw the deposition of Michelle Michaud. First, he said he knew "little or nothing" and that "Chad Bowen and Dustin Bowen owned it." (Jackson Dep., at 188).

He added that the commission arrangement "means that if his two sons can do that much marketing and make that much, then they're damn good at what they do." (Jackson Dep., at 189). Later he said that before the deposition he didn't know anything at all about IMG, and everything he knew about it came from the deposition. (Jackson Dep., at 191-192). There was nothing at all in the cited testimony about the February 23, 2003 meeting or whether he approved the 5% commission to IMG. Moreover, previous marketing agreements between N'Genuity and unrelated firms paid between 4% and 7% commission on sales. (*Response*, at 20; Exs. LL, MM, NN).

Still, Mr. Jackson has valid concerns. On two occasions – August 3 and 17, 2009 – N'Genuity issued $100,000 checks payable to "Valerie Littlechief," (Dkt. # 210, Ex. 16 (check #3239, 1610), both of which were recorded as "Loan Receivables – IMG." (Dkt. # 210, Ex. 16). In other words, N'Genuity treated the $200,000 to Ms. Littlechief as a loan to IMG, rather than a loan or payment to Ms. Littlechief. This increased the amount of money that IMG supposedly owes N'Genuity to $439,501.90. To date, this "loan" has not been repaid, (Dkt. # 210, Ex. 17), and under

---

[23](...continued)
maintained. These are all matters to be resolved as the case moves forward.

the plan of merger, this and all other obligations of IMG will be effectively canceled. (*Plaintiff's Memorandum*, Ex. D, ¶1(c)). Defendants' response brief fails to account for these two payments in their discussion regarding IMG. (*Defendants' Response*, at 17-22).

While the defendants neglect the $200,000 in their brief, Mr. Clouser says this about it in his declaration:

> Plaintiff argues that N'Genuity improperly paid Ms. Littlechief for money it owed to IMG, . . . . Checks written to her were reflected on N'Genuity's books as new loans to IMG and posted to Loan-Receivables-IMG. Thus, N'Genuity's financial statements correctly reflected its financial condition. This was done to utilize the tax savings advantages from the IC-DISC in 2009.

*Defendants' Response*, Ex. A, ¶ 19).

Mr. Clouser does not explain how a $200,000 payment to Ms. Littlechief, recorded as a loan to IMG, could have been proper or how it could have anything to do with the IC-DISC, Littlechief Specialties. Ms. Littlechief was not a shareholder/member of IMG – Dustin and Chad Bowen were. And the only payments that count under the IC-DISC regulations would be those from N'Genuity to Littlechief Specialties. Ms. Littlechief would have a tax obligation to the United States either then or in the future when the distributions of the "commissions" to the DISC were made. But under the Clouser method of accounting, IMG now owes N'Genuity $200,000 on N'Genuity's books even though no money went to IMG.

For Mr. Clouser, it seems that the only consideration is that N'Genuity's books reflected $200,000 leaving the company. It seems unlikely, to say the least, that GAAP and the IC-DISC regulations would sanction this approach. In short, Mr. Clouser's explanation is no explanation at all. This is perhaps why the defendants avoid any reference to it in their Response brief. A receiver would assure that the kind of self-dealing reflected by the present record would cease.

Finally, Mr. Jackson argues that under the plan of merger N'Genuity shall be responsible and

liable for all the liabilities and obligations, not only for itself, but for IMG as well. (Memorandum In Support Of Motion For A Preliminary injunction, Exhibit D). He points out that the Internal Revenue Service is currently auditing IMG. [187 – 1]. If the audit were to go badly, and the merger were to go through, it would potentially affect the value of N'Genuity and thus the value of Mr. Jackson's shares in the company. However, the point raised by Mr. Jackson, although potentially valid, is speculative and need not be further considered.

When the evidence thus far adduced is considered as a whole, Mr. Jackson has shown a greater than negligible likelihood that he will succeed on his claim that IMG is a vehicle whose real and only purpose is to funnel monies from N'Genuity to Ms. Littlechief at Mr. Jackson's expense.

### D.
### The Shrinkage Of Mr. Jackson's Stake In N'Genuity

By way of what Mr. Jackson characterizes as secret meetings held on December 2, 2008, and January 27, 2009, Dustin Bowen was elected as a director and Mr. Jackson's shares were reduced to from a 49% ownership interest to, according to defendants, less than a 5% interest. [Dkt. #1, ¶¶ 36-41, 46-50). Defendants have an entirely different version of what happened. In the summer of 2008, N'Genuity learned that payments it had made to Ms. Littlechief and Mr. Jackson violated SBA rules limiting salaries and that approximately $400,000 needed to be returned to the company in order to be in compliance with the SBA rules. Moreover, because of the economic downturn, N'Genuity was being forced to pay for some products long before receiving payment from its customers and was in need of additional capital. (*Jackson Dep*., pp. 22, 127-29). Mr. Jackson testified that he refused to pay anything back because he hadn't made the mistake and he was, he

claimed, told that he had to repay the whole $400,000. (Jackson Dep., pp. 22, 129).[24]

N'Genuity gave Mr. Jackson notice of a shareholder meeting for November 25, 2008, at which the board of directors would be increased from two to three members, and the articles of incorporation would be amended to increase the number of authorized shares by 49,000. (*Defendants' Memorandum*, at 4). Mr. Jackson's counsel asked that the meeting be postponed to December 2, 2008, and it was rescheduled for that date. What happened that day is disputed. N'Genuity claims that Mr. Jackson's attorney called and left a message saying Mr. Jackson would not be participating in the meeting. Mr. Jackson's attorney says that N'Genuity's counsel left him a message saying that the meeting had again been postponed. (*Defendants' Memorandum*, at 4).

At the December 2nd meeting, the shareholders – which, in Mr. Jackson's absence, meant Ms. Littlechief and her 51% – approved the measure increasing the board of directors from two to three. Then, the majority shareholders – again, Ms. Littlechief – voted Dustin as the third board member. Those two then authorized, by a 2-0 vote, the issuance of an additional 49,000 shares. On January 27, 2009, there was another meeting at which the shareholders – meaning Ms. Littlechief and Mr. Jackson – were offered the opportunity to purchase pro-rata shares of 10,800 shares at $43 per share. Ms. Littlechief bought 51% of those shares, but Mr. Jackson, represented by his counsel by telephone declined. Ms. Littlechief purchased the remaining 49%, paying $442,000 overall. (*Defendants' Response*, Ex. F, Checks from Ms. Littlechief to N'Genuity).

---

[24] In his reply brief, Mr. Jackson argues that he was told that he had to pay back the full amount, and that the reason he refused was because "he could not understand why it was his sole responsibility to pay the full amount." (*Plaintiff's Reply*, at 22). Mr. Jackson did testify that he was told that he had to pay back the full $400,000 (Jackson Dep., at 22) – whether that was the case is a disputed matter. But when asked why he refused he said, "Because I didn't make that – I didn't make that mistake, he did." (Jackson Dep., at 129).

Mr. Jackson does not dispute that, despite the problems with the scheduling of the December 2nd meeting, he had the same opportunity to purchase shares of stock as Ms. Littlechief did, but chose not to do so. (*Plaintiff's Reply*, at 21-23). He also submits that defendants cannot explain how authorizing the sale of stock would have solved the problems with the SBA. (*Plaintiff's Reply*, at 22). But supposedly the $400,000 represented the amount of salary Mr. Jackson and Ms. Littlechief received over SBA limits for small businesses. Moreover, despite the disagreement between counsel over the voicemails in December 2008, Mr. Jackson does not argue that, well before the January 27, 2009 meeting, he was aware of the stock issuance plan; he did, after all, get notice of it in November 2008. Eight months later, on September 22, 2009, Mr. Jackson filed this lawsuit.

About two years after Ms. Littlechief purchased the newly issued shares, on February 22, 2011, Mr. Jackson got notice of another special meeting. This time, the topic was the consideration and approval of a merger of N'Genuity with and into IMG. The merger would, among other things, result in the cancellation of those N'Genuity shareholders holding less than 5% of the issued common stock. (*Plaintiff's Memorandum of Law in Support of request for Preliminary Injunction,* at 4, Ex. D, Agreement and Plan, at 2). Mr. Jackson claims that "according to [defendants], . . . [he owned] less than a 5% share." (*Plaintiff's Memorandum of Law in Support of request for Preliminary Injunction,* at 4). He cites eleven paragraphs of his original, now superseded, complaint, which is, ineffective since "an amended complaint supersedes an original complaint and renders the original complaint void." *Flannery,* 354 F.3d at 638 n. 1. Moreover, none of those paragraphs say anything about the defendants telling him he had less than a 5% interest. [Dkt. #1, ¶¶ 36-41, 46-50).[25] Mr. Jackson had a dissenter's right to redeem his shares for fair value.

---

[25] Ms. Littlechief owns all 10,800 shares of additional common stock, as Mr. Jackson chose not to
(continued...)

(*Plaintiff's Memorandum of Law in Support of Request for Preliminary Injunction,* Ex. D, at 2).

Mr. Jackson contends that the merger, itself, represents a breach of fiduciary duty given the intimate, familial relationship between the stockholders and officers of N'Genuity and IMG. Dustin Bowen owned IMG and was one of just three officers and board members at N'Genuity. Ms. Littlechief was a second N'Genuity officer and board member, not to mention the shareholder with the controlling interest. Loans supposedly to IMG were in actuality direct payments to Ms. Littlechief, etc., etc. For Mr. Jackson, that is, understandably, too much closeness for comfort.

The defendants do not address the contemplated merger between N'Genuity and IMG. On the subject of IMG, they focus exclusively on N'Genuity's marketing contract with IMG. Their discussion of the facts leading to this litigation ends with N'Genuity's issuance, and Ms. Littlechief's purchase, of the 10,800 additional shares in N'Genuity. They have failed to make a meaningful response to Mr. Jackson's showing that the merger is neither fair to him nor to N'Genuity.

Furthermore, they do not deny that the merger will cause irreparable harm to Mr. Jackson. And failure to respond to the plaintiff's argument regarding irreparable harm and inadequate remedy at law with a reasoned and supported argument implies concession. *See Milam v. Dominick's Finer Foods, Inc.,* 567 F.3d 830, 832 (7th Cir. 2009)(Easterbrook, C.J.) ("My earlier opinion explained why secrecy appears to be unwarranted, and I take plaintiffs' silence in their response as acknowledgment"); *Law v. Medco Research Inc.*, 113 F.3d 781, 787 (7th Cir.1997) ("Failure to

---

[25](...continued)
purchase any. Without knowing how much stock was originally issued, how much total stock was outstanding, and how many shares Mr. Jackson owned, however, there is no way to tell what percentage of the total outstanding shares Mr. Jackson now owns. Mr. Jackson does not explain this in his brief. (*Plaintiff's Memorandum of Law in Support of request for Preliminary Injunction,* at 4). But in his 20-page Ex. D, there is a shareholder list that says, presently, Littlechief had 10,800 shares and Jackson had 490 (suggesting that the original amount was 510-490). That would give Mr. Jackson 4.3%.

contest a point is not necessarily a waiver, but it is a risky tactic, and sometimes fatal."); *MCI WorldCom Network Services, Inc. v. Atlas Excavating, Inc.,* 2006 WL 3542332 at *3 (N.D.Ill.2006)(failure to respond constitutes waiver); *Drummer v. Bank,* 2006 WL 2051331 at *5 (N.D.Ill. 2006)(same). *Cf. Jackson v. Parker*, 627 F.3d 634, 635 (7th Cir. 2010)(arguments not made to the district court are forfeited); *Coronado v. Valleyview Public School Dist. 365-U*, 537 F.3d 791, 797 (7th Cir. 2008); *Wallace v. City of Chicago*, 440 F.3d 421, 424 (7th Cir. 2006).

Under Arizona law, if the merger were to proceed, Mr. Jackson would lose his stock ownership in N'Genuity. (Plaintiff's Memorandum In Support Of Request For Preliminary Injunction, Ex. D., Agreement And Plan Of Merger, at ¶ 2(b)). He would have only the right to receive the fair value of his shares, with the fair value being determined by the Board of Directors of N'Genuity. *Id.* It could hardly be said that given the conduct of the defendants to date, they could be counted on to provide a fair assessment of value. And being a closely held corporation, the assessment of fair market value would be difficult under the best of circumstances. *Pro Finish USA Ltd. v. Johnson*, 204 Ariz. 247, 64 P.3d 288 (Ariz.App. 2003). The defendants' conduct has obviously reduced the value of N'Genuity. If a preliminary injunction does not issue to stop further improper transfers to the defendants, any assessment of fair market value of the stock in a company would be rendered inexact and unreliable.

It is no answer to say that a corporation has the right, to merge with another corporation. "It is a familiar principle that conduct which in usual situations the law protects may become unlawful when part of a scheme to reach a prohibited result." *Miller v. Milwaukee*, 272 U.S. 713, 715 (1927)(Holmes, J.).

The defendants have admitted that the merger was designed to trump the present litigation and force Mr. Jackson into litigation in the Arizona state court.(*Plaintiff's Memorandum*, Ex. EE,

49

52 *et seq.*). Given the diversions of funds and the concealment of documents and destruction of computers in this case, it is at least uncertain whether the statutory remedy would be adequate since one could not adequately evaluate the real value of N'Genuity. *See infra* at 57. In any event, an appraisal remedy like that provided under the statutes of many states, including Arizona, cannot substitute for a suit for breach of fiduciary duty or other torts. *Kademian v. Ladish Co.*, 792 F.2d 614, 630 (7th Cir. 1986).

Absent an injunction to prevent further looting of the company, any monetary award Mr. Jackson might receive in connection with his claims for fiduciary breach might prove uncollectible, thereby making "inadequate" the remedy. Inadequacy does not mean "wholly ineffectual; [it] mean[s] seriously deficient as a remedy for the harm suffered." *Rolland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 386 (7th Cir. 1984). *Accord Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003).

## E.

## The Authorities Cited In The Defendants' Response Brief

Aside from quoting a paragraph from *Tovrea Land & Cattle Co. v. Linsenmeyer*, *supra,* the defendants' 29-page response brief affirmatively cites just two cases, one for the proposition that to obtain preliminary injunctive relief, one must show irreparable harm, the other, a seventy-six year old Supreme Court case standing for the unexceptional proposition that a federal court cannot modify legal obligations under a "valid and unassailable" contract. (*Defendants' Response*, at 6, 22, 28).[26] As a result, page after page of their arguments are unsupported by pertinent legal authority.

---

[26] The defendants' emphasis on the formality that N'Genuity had a contract with IMG is misplaced. The most successful schemes "are those dressed in the garb of honesty and hedged about with all the appearances of legal and enforceable undertakings."*Brooks v. United States*, 146 F. 223, 227 (8th Cir. 1906).

(continued...)

The defendants' response to Mr. Jackson's reference to *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir. 1993) accuses him of misleading the court by failing to provide the salient portion of the case, namely, that dealing with the factors to be considered when determining whether to appoint a receiver. A more careful reading of Mr. Jackson's brief would have disclosed that a few sentences later, it did refer to that portion of the citation to which the defendants refer. (*Plaintiff's Renewed Motion for Appointment of Receiver*, at 4-5).

In *Aviation Supply*, the court said:

> Although there is no precise formula for determining when a receiver may be appointed, factors typically warranting appointment are a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm.

999 F.2d at 316-317 (emphasis added).

The courts are in agreement that the highly discretionary nature of the appointment of a receiver is inconsistent with any formulaic or algorithmic method for determining when the appointment is appropriate. It is not a necessary prerequisite to the appointment of a receiver that any particular condition be shown, such as insolvency of the defendant or any other status. (It may be parenthetically noted that the defendants concede that N'Genuity could not pay IMG what it "owed" because it needed the money for working capital– an odd situation given the rather large gross revenues of the Company)(*See Defendants' Response* at 18). Rather, the district court must take into account "all the circumstances of the case," *Connolly v. Gishwiller,* 162 F.2d 428, 435 (7th

---

[26](...continued)
*See also SEC v. Elmas Trading Co.*, 620 F. Supp. 231, 233 (D. Ariz. 1985). Mr. Jackson's contention is the IMG contract was a sham, designed to divert funds to the defendants-hardly an "unassailable" contract.

Cir. 1947), instead of attempting to rely on a "precise formula" for making the determination. "[N]o one factor is dispositive." *Canada Life Assur. Co. v. LaPeter,* 563 F.3d 837, 845, 848 (9th Cir. 2009).

*Aviation Supply*'s upholding of the district court's discretionary decision to appoint a receiver was based in part on the fact that "when [plaintiff] pressed for discovery, [defendant] provided an inaccurate financial statement." 999 F.2d at 317. That pales in significance to what occurred here throughout discovery. Another factor to which the court looked was the attempt to conceal ownership by granting a security interest to a relative in order to thwart the plaintiff's recovery. *Id.* Had the defendants' concealment of evidence been successful, the plaintiff might have been unable to carry its burdens to show likelihood of success on the merits and the other factors the plaintiff has the burden of proving here. To paraphrase *Aviation Supply*, "faced with this pattern of willful nondisclosure and false disclosure," and the unbridled and often unaccounted for use of corporate funds by insiders and family member, "the district court [i]s well within its discretion in turning to a drastic remedy such as a receiver." *Id.* at 317.

Defendants also argue that, under *Aviation Supply*, an important factor to consider in deciding a motion for a receiver is whether it would do more harm than good. (*Defendants' Response*, at 28 (citing *Aviation Supply*, 999 F.2d at 316-17)). They say that would occur here because the appointment of a receiver would jeopardize N'Genuity's participation in the Small Business Administration's Section 8(a) program. The argument is that the 8(a) program is limited to small businesses which are "unconditionally owned and controlled by one or more socially and economically disadvantaged individuals . . . ." 13 C.F.R. 124.101. (*Response* at 28). Beyond citing the language of the C.F.R., the defendants make no argument and cite no case that the appointment of a receiver would violate the requirements of the C.F.R. and result in a termination of SBA certification – exactly what that would mean is not clear. Under consistent Seventh Circuit

52

precedent, skeletal and unsupported arguments like this are waived. *Dexia Credit Local v. Rogan*, 629 F.3d 612, 624-625 (7th Cir. 2010); *Plan Trust Funds v. Royal Intern. Drywall and Decorating, Inc.*, 493 F.3d 782, 789 (7th Cir. 2007).

Moreover, the argument that the appointment of a receiver would jeopardize N'Genuity's participation in the Section 8(a) SBA program puts out of view the defendants' counsel's email earlier this year to Mr. Jackson's attorneys:

> You had asked about whether N'Genuity has withdrawn from any SBA programs. My understanding is that it requested early withdrawal from the SBA's 8(a) program. The company has not been officially advised that this has been acted upon by the SBA, although it has been told informally that this request will be granted. Our understanding is that withdrawal is not official until published on an SBA website.

(*Plaintiff's Reply*, Ex. I).

Whether N'Genuity's withdrawal from the Section 8(a) program is official or not, it has been requested and is, at the very least, imminent. That is more than a reasonable conclusion since the representation has never been withdrawn, and the defendants never sought to file a sur-reply contesting the plaintiff's position. That the withdrawal is at hand perhaps accounts for N'Genuity's not having submitted certain Worksheets to the SBA after 2009. *See supra* at 19. For defendants' attorneys to now to rely on N'Genuity's participation in the 8(a) program as a basis for denying the motion for appointment of a receiver is a non-argument.

At a hearing on September 30, 2011, counsel for N'Genuity again raised concerns about the effect of the appointment of a receiver on SBA certification. When I pointed out that his co-counsel had informed Mr. Jackson's counsel of the company's withdrawal from the section 8(a) program, counsel responded that there were three separate certifications and withdrawal had only been sought under the Section 8(a) program. None of this was flagged in the briefing. Quite the contrary. There

was simply a reference to the Section 8(A) certification and 13 C.F.R. §124.101, followed by this uninformative sentence: "Similar provisions apply for other SBA programs." (*Response* at 28). If this were intended as an argument regarding the effect of the appointment of a receiver on other SBA certifications, it certainly did not begin to make the case. This is skeletal, perfunctory, and undeveloped briefing in its starkest form. *Sternberg v. Debuys*, 1992 U.S.App. LEXIS 14606 (9th Cir. 1992) (one sentence was insufficient to raise issue). And counsel's apparent attempt at the hearing to expand on the certification argument, if that's what the reference was, comes far too late.

Finally, there is a question of the appropriateness of the appointment of a temporary receiver in conjunction with the issuance of a preliminary injunction. The defendants do not point to a single case that precludes both forms of equitable relief from being granted and operating simultaneously, at least for a time. More importantly, a rigid rule prohibiting the concurrent use of a receiver and a preliminary injunction would be inconsistent with, and contrary to "the adaptable character of federal equitable power," with its "' unquestionable authority to apply its flexible and comprehensive jurisdiction in such manner as might be necessary to the right administration of justice between the parties,'... 'and to satisfy the needs of a progressive social condition in which new primary rights and duties are constantly arising and new kinds of wrongs are constantly committed.'" *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc*., 527 U.S. 308, 336 (1999).

In many cases, the grant of a preliminary injunction might make unnecessary further equitable relief in the form of a receiver. Here, however, the defendants have shown a stubborn refusal to abide by their discovery obligations and to abide by court orders. And more, they have shown through their payment of $135,000 to Gallagher & Kennedy after the TRO was extended by

agreement that they cannot be trusted to be obedient to court orders. *See supra* at 26. Hence, under the particular circumstances presented by this case, it is appropriate to appoint a temporary receiver, with limited power to be defined by the court, in addition to granting preliminary injunctive relief. *Cf. Lake Shore Asset Management Ltd. v. CFTC,* 511 F.3d 762, 765 (7th Cir.2007)(The district judge "appointed a receiver to take over Lake Shore's operations and bring it into compliance with the injunction. Injunctions must be obeyed; there is no other alternative.").

## F.
## Irreparable Harm And Inadequacy of Legal Remedies

Mr. Jackson's case in favor of granting a preliminary injunction has three goals. The first is the prevention of further dissipation of N'Genuity's assets by the defendants through disguised transactions that benefit Ms. Littlechief and her family. An injunction against this activity is not forbidden merely because a temporary receiver is appointed. Given the history of the defendants' conduct in this case, a preliminary injunction, with its threat of contempt, is an appropriate adjunct to the appointment of a receiver and, indeed, may well be indispensable if the receiver is to have the cooperation of the defendants.

The second component deals with payments to IMG and Littlechief Specialties. Mr. Jackson's gripe with IMG is that it has been paid $5 million by N'Genuity for having done nothing. Mr. Jackson may have approved the original deal between IMG and N'Genuity, but on the perfectly reasonable assumption that it would be run in good faith and actually perform the marketing services it promised to provide. There is substantial evidence in the form of Ms. Michaud's testimony that IMG is not what the defendants claim it to be. There are also very substantial amounts of money going directly from N'Genuity to Ms. Littlechief and being shown on N'Genuity's books as a loan to IMG.

The fact that N'Genuity's gross revenues have been expanding in the years since IMG came on the scene does not prove that IMG is responsible for the increases in revenue, as the defendant's claim, rather than Mr. Jackson, as he insists. The defendant's timing argument is little more than a form of *post hoc ergo propter hoc.* "But that is the name of a logical error, not a reason to infer causation." *United States v. Thompson*, 484 F.3d 877, 879 (7th Cir. 2007); *Bermudez v. TRC Holdings Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998). The only concrete evidence regarding IMG's contribution to N'Genuity's revenues is the testimony of a former employee, Ms. Michaud, who was emphatic that IMG was a fake company that did no marketing at all. *See supra* at 39.

As for the IC-DISC, Littlechief Specialties, the evidence shows almost $1,200,000 been paid to it from N'Genuity since its formation, in April 2009 through 2010. The evidence also shows hundreds of thousands of dollars directly to Ms. Littlechief, which is then reflected on the company's books as a payment to Littlechief Specialties. Under the tax laws, all of the monies paid to the DISC will go to Ms. Littlechief, with a small percentage to her stepson, who was also a stockholder, in their capacities as the DISC's shareholders. Mr. Jackson receives no benefit from transactions involving Littlechief Specialties.

The third issue with which a preliminary injunction would deal is the proposed merger of N'Genuity with IMG; a merger that would result in the cancellation of Mr. Jackson's minority interest, leaving him with a suit under Arizona law to have his interest valued by a court. In light of the present record regarding IMG and the extraordinary diversion of funds from N'Genuity to Ms. Littlechief and her relatives, and the complete absence of evidence required by Arizona law that the merger would be fair to N'Genuity and its stockholders, allowing the contemplated merger to proceed would permit the defendants to consummate the scheme that Mr. Jackson contends exists.

Mr. Jackson has adduced sufficient proof to show that he has at least some likelihood of prevailing on the merits of his fiduciary breach claims and that he is likely to suffer irreparable harm if preliminary injunctive relief is not granted. Absent an injunction, the defendants are free to continue their looting of N'Genuity, thereby rendering any potential damage award "inadequate" because it would be "seriously deficient as a remedy for the harm suffered." *Rolland Machinery Co.,* 749 F.2d at 386.

Further, given the substantial diversion of funds shown by the presently available evidence, and the uncertainty of the defendants' production, at least at this point, of all the relevant historical financial information needed to accurately assess the financial health and status of N'Genuity, a suit to value his shares at this point would also be "inadequate." Mr. Jackson has also shown that the harm he would suffer if an injunction is denied is substantially greater than the harm the defendants would suffer if injunctive relief is granted. Indeed, the only harm that they will suffer is a temporary suspension of a merger for which there is no proof of urgency and, more importantly, no proof that it would be fair either to Mr. Jackson or to N'Genuity, itself. The defendants certainly cannot argue that they will suffer any harm by a preliminary injunction that prohibits improper diversion of funds to themselves or to entities that they own and control and that simply requires that they abide by fiduciary principles that they already claim they are honoring. Finally, an injunction is clearly in the public interest, for it will do no more than require obedience to the fiduciary duties the defendants owe Mr. Jackson under Arizona law. Defendants cannot be permitted to evade liability for breach of their obligations as corporate officers and directors by engaging in a merger, the purpose of which on the strength on the present evidence to prevent Mr. Jackson from pursuing what the evidence thus far shows is legitimate claims against them, claims that are likely to succeed.

## CONCLUSION

The plaintiff's motion for the appointment of a temporary receiver is GRANTED. The plaintiff's motion for a preliminary injunction is GRANTED as to the merger between N'Genuity and IMG and GRANTED as to the payment of personal expenses of any kind from N'Genuity funds until a receiver is in place. It is also granted as to any loans to any of the defendants and to payments to IMG without some showing that IMG is actually performing needed marketing services for N'Genuity. Plaintiff has indicated that he has a list of possible receivers and a proposal detailing the scope of the receiver's duties. These issues, the question of bond, and the specifics of the preliminary injunction will be discussed with the parties at the hearing on October 4, 2011.

It is important to underscore the limited nature of the determinations made in deciding the motions for receiver and the Motion for Preliminary Injunction. A preliminary injunction is preliminary, and involves "significantly different" inquiries than resolution of a case on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 393(1981). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Id*. at 395. Consequently, a plaintiff is not required to prove his case in full at the preliminary injunction stage, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at a trial on the merits. *Id*. The same is true of a motion to appoint a receiver. *Matter of McGaughey*, 24 F.3d 904, 907-08 (7th Cir. 1994).

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 10/3/11

58

# APPENDIX

| | | |
|---|---|---|
| **VINCENT E. JACKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 09 C 6010** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **N'GENUITY ENTERPRISES CO., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

On March 3, 2011, Judge Lefkow entered a TRO against the defendants. [Dkt. #198]. Pursuant to 28 U.S.C.§ 636 (c), the parties, on March 31, 2011, consented to jurisdiction here for resolution of Plaintiff's Motion for Preliminary Injunction and Motion for Appointment of a Temporary Receiver. [Dkt. ## 215, 220]. On April 1, 2011, Judge Lefkow entered an agreed order extending the TRO and instructing the parties to appear before me on April 1, 2011 at 9:30 to set a date and time for a hearing on plaintiff's Motion for Preliminary Injunction. The Order recited that "[t]he parties agreed to extend the TRO to that date." [Dkt. ## 218, 219]. Thereafter, in various hearings in open court before me, counsel for all the parties, including Mr. Krasnow and Mr. Glover, expressly agreed to extend the TRO until ruling on the motion for preliminary injunction.

In preparing the opinion on that motion, it became apparent that no order had been entered on the docket reflecting the agreement. I informed the parties of that omission and asked that they prepare an agreed order reflecting the agreement that no one disputed and which had been reaffirmed

on more than one occasion. In an exchange of e-mails between the court and counsel for the parties on this issue, Mr. Miller, co-counsel for the defendants, did not dispute the existence of such an agreement; he merely thought Judge Lefkow's order of April 1, 2011 made unnecessary any further order. A copy of that email was sent to all counsel, including his co-counsel, Messrs. Glover and Krasnow. Mr. Miller said in his email to me:

> Although the language if [sic] of the April 1 Order [of Judge Lefkow] is less than clear it is my understanding that the parties have behaved in a manner consistent with the language stating, "The parties agree to extend the TRO to that date" as meaning that the TRO is extended *until the time of a hearing and ruling* on the plaintiff's Motion for Preliminary Injunction.

[Dkt. #332](Emphasis supplied).

I disagreed with his reading of Judge Lefkow's order and explained my reasoning in a responsive email, but noted that the matter is "academic" since as the email confirms "we had all operated on the premise that all parties had agreed that the TRO would be extended until the preliminary motion was decided. In fact, that was explicitly agreed on at least one, and perhaps two or three court hearings." I asked that counsel send me an appropriate agreed order reflecting the agreement "so that in the event the case goes to the court of appeals, that court will be under no misapprehension as to what happened." [Dkt. #332].

On September 19, not having received the requested order, I asked my courtroom deputy to call to inquire if the order had been prepared. Before she could do so, counsel for the plaintiff called my secretary and said that a dispute had arisen and asked if I could see all counsel. I did so at 11 o'clock. Mr. Miller appeared for the defendants, with Mr. Glover participating by phone. Mr. Miller now took the position that if the defendants had agreed to extend the TRO until the ruling on the motion for preliminary injunction – his co-counsel's email to plaintiff seemed unwilling to

concede even that [Dkt. #333] – the defendants would no longer honor that agreement because they had concluded the motion had not been decided quickly enough. This sudden shift in position carefully put out of view the unconditional nature of their agreement and the long history of non-compliance with discovery by the defendants, both before the consent here and after the agreement to extend the TRO, and the effect of that misconduct on the pace of the case.

There have been four versions of plaintiff's motion to appoint a receiver [Dkt. ## 80-81, 140, 202, 210] and a supplement [Dkt. #263]. There have been two versions of his motion for a preliminary injunction. [Dkt. ## 226, 230]. These successive motions were, to a large extent, precipitated by the defendants' recalcitrance throughout the discovery process, which has given rise to motion to compel after motion to compel. It would seem that the defendants were in no mood to participate in the cooperative discovery required by the Federal Rules of Civil Procedure in the absence of repeated motions to compel and court orders requiring compliance with discovery requests. [*See e.g.,*Dkt. ## 69, 74, 100, 109, 111, 122, 124, 126, 127, 129, 130, 131, 134, 160, 162, 166, 171, 202, 203, 209, 226, 235, 259, 307, 320]. And even then they were non-compliant. [*See e.g.*, # 226, 307, 320].

As defendants reluctantly and sporadically produced records, plaintiff's counsel necessarily had to update their filings. And many documents defendants had not produced miraculously appeared when the defendants used them for their own purposes in their responses to Mr. Jackson's motions seeking a temporary receiver and preliminary injunction. The defendants even criticize the analysis undertaken by Mr. Jackson's accountant, Michael Pakter, as being based on limited information (*Defendants' Response*, at 9-10), when the extent to which the information Mr. Pakter had was due to the defendants' failure to provide records.

On May 4, after counsel for the defendants had simply ignored the briefing schedule on the motions for appointment of a receiver and motion for preliminary injunction, the plaintiff filed a motion for a summary granting of the motions. No motion to extend the date of the filing of the defendants' brief was ever made, no brief was filed, and no justification for this omission was made. While I denied the plaintiff's motion, new dates had to be put in place. The Order went on to require the defendants to produce all documents relating to N'Genuity's dealings with the Small Business Administration. While an appropriate discovery request for those documents had been made to the defendants, the defendants objected to production on the ground that they did not have possession of the documents, which were in the possession of their lawyers. One of their lawyers in this case, Mr. Glover, was also counsel for N'Genuity's in its dealings with the SBA. The Order noted that the objection "could scarcely be more frivolous or more pretextual" since documents in the hands of a party's lawyer are within that party's possession, custody or control. [Dkt. #226].

As recently as September 7, 2011, the defendants were defying an order entered five months earlier on March 14, which required the defendants to immediately begin production of corporate and personal bank and financial records [Dkt. # 202] – records they had objected to producing. After five months, the defendants had yet to comply with that order. The stalling tactics undertaken by the defendants are detailed in Mr. Jackson's recent motion to compel. [Dkt. # 307]. At the hearing on that motion, defense counsel revealed that the individual defendants, rather than request all their bank statements and checks from their banks at once, requested a few at a time. Defense counsel sought to justify this behavior and also seemed to feel that there was an issue as to whether checks were even included in the order, especially in the case of Ms. Littlechief. But Ms. Littlechief was not singled out as a special case in the order, and the issue of checks was covered at the

arguments that preceded the order. [Dkt. # 314].

The order of September 7, 2011 noted the defendants' continued non-compliance with the Order of March 14, 2011 and stated that "the conduct of the defendants in connection with their non-compliance with the Order of March 14, 2011 is especially egregious and reflects a continued disdain for and disregard of court orders and discovery obligations imposed by the Federal Rules of Civil Procedure." The order went on to caution the defendants that a continuation of discovery non-compliance would result in a recommendation to Judge Lefkow to revoke the permission granted Mr. Glover to appear *pro hac vice* and/or that a default judgment against the defendants be entered. The order concluded by noting that "[t]he defendants' non-compliance with the order of 3/14 is simply the most recent instance in a long history of non-compliance with discovery obligations." [Dkt. #320].

One of the prior instances in that long history was summarized in the Order of March 28, 2011, which said:

> At the over two-hour hearing on the motion to compel today, I expressed the view that I have shared with the parties at various times over the past several months, namely that the defendants have utterly failed to comply with their discovery obligations. Rather, at almost every turn, they have attempted to frustrate discovery and to conceal critical information. The most dramatic example involves the claim that there were no accounting or equivalent records for the corporate defendant, N'Genuity, either in digital or paper form for an eight to nine year period, even though the company was bringing in many millions of dollars annually.[27]. I had expressed the view that the representation that there were no records was "inherently incredible," and no court is bound to accept inherently incredible evidence. [Citations omitted]. Ultimately, my dubiety proved to have some foundation and following a court-ordered forensic examination of the defendants' computers, [[#155, 160]] the untruth of the repeated representations that there were no accounting records was

---

[27] The defendants claimed that N'Genuity's books and records were destroyed when N'Genuity changed its accounting system to Quickbooks, and that there were no paper accounting records, and that the company did not even maintain a general ledger. All of this was false, as the court ordered forensic examination of the defendants' computers would reveal. [Dkt. #155].

revealed. This is not an isolated instance but one of many examples of the intransigence that has marked discovery in this case.

* * *

At the hearing today, counsel for the defendants insisted that there has been no wrongdoing in discovery and if there have been lapses, they have been unintentional and made in good faith. I expressed the view that of the cases I have seen since becoming a judge, the conduct of the defendants in this case in discovery was the second worst that I had seen. [Citation omitted].*** This is not meant ... to indicate some ultimate opinion on the merits. I do not have sufficient proof before me to make such a judgment and, in any event, that is not my role in the case. I do, however, have sufficient first-hand, extensive involvement in the case to be able fairly to express again, as I have in the past, my grave concerns about the way in which the defendants have approached and dealt with their handling of discovery at every turn.

[Dkt. #209].

As the docket further reveals, the briefing on the pending motions was not complete. In fact, the plaintiff filed, on the morning of September 19, the Reply In Support Of His Supplement To Motion For The Appointment Of A Receiver And For Other Relief. [Dkt. #331]. The reply also contained a discussion of why the defendant should be held in contempt for having violated the May 4 Order [Dkt. #235] and an explanation of why the defendants should be compelled to respond to the tenth request to produce.

In short, the defendants are not at liberty to withdraw from an agreement that they and their array of experienced counsel unconditionally agreed to and to substitute a new agreement under which they would cease to be bound by the TRO and would only be required to give plaintiff's counsel three days notice of any conduct that the defendants deemed would otherwise fall within the scope of the TRO. Promises made to judges and relied on by the court and opposing counsel are not so easily ignored. *Cf. Charter House Insurance Brokers, Ltd. v. New Hampshire Insurance Co.,* 667 F.2d 600, 604 (7th Cir.1981)("an attorney's promise in open court to produce certain documents

'could be treated as the equivalent of an order' for Rule 37(b) purposes.").

It is especially unreasonable for the defendants to seek to justify their attempted, unilateral breach on a claimed delay that in no small measure is traceable to their own conduct in discovery – including having lied for months on end that N'Genuity had no books or records either in paper of digital form and their refusal to abide by explicit court orders. "'He who prevents a thing from being done may not avail himself of the non-performance which he has himself occasioned, for the law says to him in effect 'this is your own act, and therefore you are not damnified....'" *R.H. Stearns Co. v. United States*, 291 U.S. 54, 61-62 (1934) (Cardozo, J.). *Cf., United States v. Goodwin*, 449 F.3d 766, 772 (7th Cir. 2006) (Posner, J.)("It is in that sense that he is the author of the delay of which he complains."); *United States v. Cohen,* 145 F.2d 82 (2nd Cir. 1944) (L. Hand, J.), *cert. denied,* 323 U.S. 799 (1945)("It is particularly unreasonable for the accused ... to complain of that confusion of which they were the authors.").

The defendants continue to be bound by the Temporary Restraining Order to the extension of which they agreed. Disobedience of that order will have serious consequences.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 9/19/11